**METRO DISPLAY ADVERTISING, INC., a California Corporation, Plaintiff–Appellee,**

v.

**CITY OF VICTORVILLE, a California Municipal Corporation; Terry Caldwell, Mayor; Felix Diaz, Councilman; Guy Patterson, Councilman; Individually and in Their Respective Official Capacities, Defendants–Appellants.**

No. 96–55317.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1997.

Decided May 6, 1998.

---

Christopher W. Garrett, Latham & Watkins, San Diego, California, for defendants-appellants.

Paul E. Fisher, Fisher & Delsack, Newport Beach, California, for plaintiff-appellee.

Before: BROWNING and KLEINFELD, Circuit Judges, and MERHIGE, District Judge.*

KLEINFELD, Circuit Judge:

This is a qualified immunity claim by municipal officials relating to censorship of posters in bus shelters. The district judge wrote a sound and well articulated decision with which we agree.

### Facts.

■ This is an appeal from denial of a motion to dismiss for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6), so we assume for purposes of decision that the facts are as stated in the complaint. The facts below are as alleged, and have not been proved. The reason that we have jurisdiction, despite the interlocutory nature of the decision, is that the motion was by public officials to obtain the benefit of qualified immunity from suit, and they have appealed under *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

Metro Display is in the business of leasing bus shelter advertising space. It spent hundreds of thousands of dollars building bus shelters for the City of Victorville, with 76 sign spaces in 38 shelters. In exchange, its contract with the City of Victorville entitled Metro to use the shelters it built for advertisements.

Metro Display's standard policy is to sell advertising space throughout southern California to "all comers." Space is regularly used by local and national advertisers for commercial, noncommercial, religious, charitable and public service communications, which change regularly.

Metro's contract with the City of Victorville contained limitations on indecent and vulgar advertisements, and on advertisements for the competition within one block of a business. Also, Metro could not display anything likely to mislead traffic, and it had to give the municipality one free panel for every ten shelters. None of these contractual restrictions are in dispute. The city does not claim that it had any contractual right to impose the restrictions it did. Though the contract was terminable at will, the custom in the industry is that such contracts are renewed automatically. And so this contract was, for the first few years.

Then an agency hired Metro to place five advertisements on behalf of a union protesting labor practices of a Victorville supermarket chain. Some representatives of the grocery chain complained to the municipality about the hostile ads in the bus shelters. Mayor Caldwell and Councilman Diaz said in city council meetings that they could not control content of advertising directly because of "First Amendment problems," but they would do it indirectly.

The mayor and councilman said that if Metro did not get rid of the ads, they would make sure Metro's contract was not renewed. Then the third named defendant, Director of Public Works Patterson, told Metro that if Metro did not remove the union ads, the city would find a pretext to cancel the contract.

Metro responded by asking the union for permission to remove the ads. The union stood on its contractual right to have at least some of the ads displayed and threatened suit if Metro breached. But Director of Public Works Patterson told Metro that all the union ads would have to be removed immediately, or the city would find a pretext to cancel the contract. Then Metro began receiving a vast increase in maintenance complaints from the city, with threats of immediate cancellation if the maintenance was not taken care of immediately. Metro could not satisfy the city, which indicated intent to nonrenew.

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge, for the Eastern District of Virginia, sitting by designation.

Metro sued for declaratory judgment, injunction, and damages. Mayor Caldwell, Councilman Diaz and Director of Public Works Patterson moved for dismissal for failure to state a claim, based on qualified immunity. The district court denied their motion, and they have appealed.

## ANALYSIS

■ "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus we examine whether it was clearly established that the law prohibited the official's conduct, and whether a reasonable person in the official's position could have believed that the conduct was lawful. *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1992); *Grossman v. City of Portland,* 33 F.3d 1200, 1208 (9th Cir.1994).

The city officials argue that under *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), their conduct "was entirely reasonable." Their theory is that *Lehman* allows a municipality the same discretion as an editor of a newspaper to make choices about the advertising that may appear in buses, and bus shelters are like buses for this purpose. They argue that, under *International Society for Krishna Consciousness v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), they are not subjected to the heightened scrutiny for restraints on speech in public forums, because the speech was in a transportation facility. Even if their position is mistaken, argue the city officials, the facts are close enough to *Lehman* that they cannot be held to have violated "clearly established" law.

In *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the municipality had a contract with the company that placed ads in buses or trolleys specifying that no political advertisements could be placed, and had not accepted any political or public issue advertising for 26 years. The Court held that the First Amendment did not require it to accept a political advertisement, because the car card

space was "[n]o First Amendment forum." *Id.* at 304, 94 S.Ct. at 2718. *International Society for Krishna Consciousness v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), holds that solicitation of funds may be prohibited in a government-operated air terminal, but not leafletting.

■ These cases offer no shelter to the City of Victorville officials in the case at bar. Among the reasons are that *Lehman* says the government restrictions on advertising "must not be arbitrary, capricious, or invidious." *Id.* at 303, 94 S.Ct. at 2717. "Invidious" means, in this context, unjustly or offensively discriminatory. *See* Webster's new International Dictionary Unabridged (2d. ed.1943); Compact Oxford English Dictionary (2d ed.1991). That means about the same thing, in context, as the qualification in *Krishna Consciousness* that regulation in public property, which is neither traditionally a forum nor designated as such, cannot be "an effort to suppress the speaker's activity due to disagreement with the speaker's view." *International Society for Krishna Consciousness,* 505 U.S. at 679, 112 S.Ct. at 2705–06. In *Lehman* all political advertising was and always had been prohibited, not just ads supporting Lehman. But in the case at bar, the city pressure was based entirely on the pro-union viewpoint of the ads. In *Krishna Consciousness,* all solicitation was banned without regard to who the beneficiaries were. What applies to this case, from *Lehman* and *Krishna Consciousness,* is the prohibition on "invidious" restraints, that is, "an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Lehman,* 418 U.S. at 302–04, 94 S.Ct. at 2717; *Krishna Consciousness,* 505 U.S. at 679, 112 S.Ct. at 2705. We need not decide whether the categorization of the bus in *Lehman* as other than a public forum extends to a place on the sidewalk used as a bus shelter, because the difference between content discrimination and viewpoint discrimination so sharply distinguishes the cases.

■ The bus shelters in the case at bar arguably could be treated as traditional public forums, because they are on the street. Streets have "'immemorially been held in trust for the use of the public and, time out

of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Arguably bus shelters should be treated as private property, because the contract entitled Metro Advertising to build them with its own money and lease out the space to such advertisers as if chose for whatever ads it liked. Private property affords the strongest protection to free speech. Arguably, perhaps the bus shelters can be analogized to what is sometimes called a "non-public forum," like the air terminal in *Krishna Consciousness,* because the space is there so that people can get out of the rain, wind and sun while they wait for a bus. We need not resolve this question, because the answer is the same regardless of the categorization. Metro Display's speech was not claimed to be speech by the government itself through hired agents, which of course could be controlled by the government. *Cf. Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

■ The government cannot regulate a private individual's speech in order to promote or restrain promotion of that individual's viewpoint. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors,* 515 U.S. 819, 827–29, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). *And see R.A.V. v. St. Paul,* 505 U.S. 377, 391–92, 112 S.Ct. 2538, 2547–48, 120 L.Ed.2d 305 (1992); *cf. Bullfrog Films, Inc. v. Wick,* 847 F.2d 502 (9th Cir.1988). No matter whether the bus shelter ad spaces were private property, a traditional public forum, a dedicated public forum, or a non-public forum, that is what the complaint says the City of Victorville officials did.

■ The officials' fallback argument is that even if Metro Display did have a constitutional right to run the pro-union ad, the law was not so clearly established that they should have realized that. We see nothing to that argument. As the city officials' recognition of "First Amendment problems" revealed, neither did they. The First Amendment is not a problem. It is a solution to a problem. The problem is government offi-

cials trying to abridge the liberty of private individuals to say what they like. *Lehman* and *Krishna Consciousness* do not establish public transportation facilities as liberty-free zones; they provide a nuanced arrangement of regulatory discretion which can in no event empower the government to engage in viewpoint discrimination among private speakers.

The officials argue that their subjective recognition of "First Amendment problems" is irrelevant because *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), adopts an objective standard. This case does not require an analysis of whether the *Harlow* standard means "knew or reasonably should have known" in the sense that actual knowledge vitiates the immunity even if many reasonable persons in the actor's position might not have known. *Cf. Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 578 (9th cir.1984). In this case, any reasonable official would have known that they could not censor ads for being pro-union, so it does not matter to the result whether the "First Amendment problems" remark and the subterfuge of claimed maintenance deficiencies shows that the officials in fact did know the law.

The officials also argue that because of *Lehman,* and the absence of a case on all fours holding that city officials could not constitutionally regulate the viewpoint of bus shelter advertisements, the law was not so "clearly established" as to deprive them of qualified immunity. "The Supreme Court and our case law do not require that degree of specificity." *Hyland v. Wonder,* 117 F.3d 405, 411 (9th Cir.1997). No fair reading of *Lehman,* upholding content discrimination neutral as to viewpoint on buses, could have led any reasonable official to think that viewpoint discrimination would have been permissible in bus shelters.

■ When the Court said it was "axiomatic" that the government could not regulate speech based upon the message it conveys, *Rosenberger v. Rector and Visitors,* 515 U.S. at 827–29, 115 S.Ct. at 2516, its choice of the word "axiomatic" disposed of arguments such as the one made by the city officials in the case at bar. The word "axiomatic" in

this context means a self-evident or universally recognized truth. American Heritage Dictionary of the English Language (2d College Ed.1985). That is to say, the proposition should be and is obvious to everyone. Even in a nonpublic forum, the category that the officials contend the bus shelters should be classified in, "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985); *see also Planned Parenthood v. Clark County School Dist.,* 941 F.2d 817, 829 (9th Cir.1991) (en banc).

AFFIRMED.