Franklin SAMMARTANO; Steven Dominguez; Scot Banks; Philip Muhilly; Glenn Gurr; Charles McKenna; Dennis Owen; Richard Eckhardt; Thomas Dunlap; Craig McCauley; Steven Bilach; Ronald James; John O'Sullivan, Plaintiffs–Appellants,

v.

FIRST JUDICIAL DISTRICT COURT, IN and FOR the COUNTY OF CARSON CITY; Justice Court of Carson City Township; Noel Waters, Carson City District Attorney; Rod Bannister; Carson City County; Robert Stutsman; William Hickey; Jeffrey Snyder, Defendants–Appellees.

No. 01–16685.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed Aug. 26, 2002.

960

Donald York Evans, Reno, NV, for the plaintiffs-appellants.

Andrea H. Nichols, Attorney General's Office, Carson City, NV, and Melanie Bruketta, Carson City District Attorney's Office, Carson City, NV, for the defendants-appellees.

Before: THOMPSON, W. FLETCHER and BERZON, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge.

Appellants in this action are individuals who were denied entrance to a Carson City, Nevada government building after refusing to remove clothing bearing symbols of motorcycle organizations. They appeal the district court's order denying their request for a preliminary injunction in their 42 U.S.C. § 1983 suit against Appellees, the First Judicial Court, the County of Carson City, and related agencies and individuals. Appellants' underlying suit claims that a court policy banning individuals who are wearing such clothing from two floors of the government building violates the First Amendment. Because Appellants have demonstrated both probable success on the merits and irreparable harm, we reverse.

## I. Background

The relevant facts are not in dispute. This suit arises out of three related incidents at the Carson City Public Safety Complex ("the Complex"), a three-story building. On the first floor of the Complex are the marriage license office, the recorder's office, and the office that receives payments for municipal court fines. Visitors do not have to pass through security to gain access to this floor. On the second floor are two courtrooms for the Justice Court of Carson City Township, the clerk's office for that court, the chambers of two justices of the peace, the office of the misdemeanor probation officer, the office of the coordinator for volunteer services, the office of the Advocate to End Domestic Violence, and the office of the Carson City District Attorney. On the third floor are two courtrooms for the First Judicial District Court of the State of Nevada, the clerk's office, and the chambers of two judges[*] of that court. In order to gain access to the second and third floors, members of the public must pass through a security station and metal detector in the lobby of the first floor.

The first of the three incidents occurred on March 9, 2001, when Appellant Steven Dominguez went to the Complex for a summoned court appearance arising out of a traffic citation. His friend, Appellant Scot Banks, accompanied him. Both men are members of The Branded Few motorcycle club, and both were wearing leather motorcycle clothing with patches identifying them as members of the club. When they tried to pass through the security station, security personnel asked them to remove their jackets, which they refused to do. Security personnel contacted the Carson City Sheriff's Department, and the responding deputy sheriff told Dominguez and Banks that they could remove their jackets and go to the second floor, or they could leave the building. When they refused to do either, they were arrested and charged with criminal trespassing. Upon their release, they were ordered to return to the court on March 26, 2001 to be arraigned on the trespassing charges.

The second incident occurred on March 26, when ten other individuals, also Appellants,[1] came to the Complex to support Dominguez and Banks. These Appellants wore jackets and vests bearing the logos of various motorcycle clubs, including The Branded Few, His Royal Priesthood, and Hells Angels. All ten were told that they would be denied admission unless they removed the clothing; all refused, arguing that they had a constitutional right to enter while wearing the clothing. All were charged with criminal trespass when they

---

1. Philip Muhilly, Glenn Gurr, Charles McKenna, Richard Eckhardt, Dennis Owen, Thomas Dunlap, Craig McCauley, Steven Bilach, Ronald James and John O'Sullivan.

refused to leave. Appellees have submitted an affidavit from a security guard at the Complex, who stated that the group that gathered on March 26 "blocked the entrance and made it difficult for people to enter and exit," and that some members of the public asked to be escorted out of the building because they were afraid of the group. An affidavit from Dominguez and Banks' attorney, who was present, disputes both statements.

No written policy governing clothing at the Complex existed at the time of the March 9 and March 26 incidents. Appellees contend that security personnel were following an unwritten policy, passed on to them by the state district court judges who work in the Complex. They contend in their brief that the unwritten policy directed security personnel not to permit individuals to proceed to the second or third floor if they were wearing "clothing having symbols, markings or words indicating an affiliation with street gangs, biker or similar organizations which could be disruptive and/or intimidating." They further contend that the unwritten policy barred the "use of words, pictures, or symbols which are degrading or offensive to any ethnic, racial, social or political group."

An affidavit from a district judge with chambers in the Complex is the only evidence submitted to the federal district court by Appellees in support of these contentions. The affidavit does not mention "biker or similar organizations" or "offensive" words, pictures or symbols, and does not refer to any building-wide policy. The affidavit states, "It has been the policy in the First Judicial District Court for security personnel to ask individuals who wear colors or gang apparel to remove the clothing prior to *entering the courtrooms*," and that "[g]ang clothing or colors and attire is disruptive and intimidating and leads to problems inside the courthouse" (emphasis added). The affidavit mentions no previous incidents involving individuals wearing biker clothing, but states that "[i]t is not unusual for contentious parties and persons supporting the opposing sides or viewpoints to mingle in the hallway, and arguments and pushing and shoving incidents have occurred." The only specific incident mentioned in the affidavit is a pending case involving Native Americans and Latinos, about which the affidavit states only that the litigants have "been cooperative and agreed not to wear apparel or engage in demonstrations of support which increase the tensions already existing or which disrupt court proceedings."

The third incident occurred April 9, 2001, when Appellants were barred from passing through security to their scheduled arraignments on the trespassing charges unless they removed their motorcycle club clothing. Appellant Franklin Sammartano, who is not a member of a motorcycle club, also came to the Complex that day to attend the arraignments of the other Appellants. Sammartano was wearing a denim jacket bearing both a Harley Davidson logo and a small American flag on the front next to the words "Try to burn this asshole." He stated in an affidavit that he was required to remove his jacket in order to gain access to the top two floors of the Complex.

Between March 26 and April 9, a written list of five "Courthouse Rules of Conduct and Attire" (the "Rules") had been drawn up for the Complex. Appellees contend in their brief, but have offered no evidence beyond the aforementioned affidavit of the district judge, that the Rules merely memorialized the policy that had already been in existence. Three of the Rules have possible application to Appellants' behavior in this case. Rule 1 prohibits the "[u]se of words, pictures or symbols which are degrading or offensive to any ethnic, racial, social or political group." Rule 3, on which

the parties and the district court have primarily focused their attention, prohibits "[c]lothing, attire or 'colors' which have symbols, markings or words indicating an affiliation with street gangs, biker or similar organizations," stating that "[s]uch clothing or attire can be extremely disruptive and intimidating, especially when members of different groups are in the building at the same time." Rule 4 prohibits "words, pictures or symbols with clearly offensive meanings. If someone wants to wear a hat saying 'f … the world' he or she can do it outside." [2]

Soon after the third incident, Appellants filed suit under 42 U.S.C § 1983 in federal district court against the First Judicial District Court, the Justice Court of Carson City, and a number of county employees. The complaint sought damages for violations of the First and Fourteenth Amendments, a permanent injunction prohibiting the defendants from refusing to admit Appellants because of their clothing, and a declaratory judgment that the Rules are unconstitutional on their face and as applied. The same day, Appellants also filed a Motion for Preliminary Injunctive Relief, seeking to enjoin the implementation or enforcement of the Rules pending final resolution of the action in federal court. The criminal trespass charges were brought based on conduct that occurred before the Rules were drawn up, and Appellees have not asserted a defense based on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), either in the district court or this court.

After a hearing, the federal district court denied Appellants' motion for a preliminary injunction. "At this preliminary stage of these proceedings," the court wrote, "it is premature to make a final determination as to whether the Courthouse Rules at issue in this case, particularly Rule 3 which specifically applies to

Plaintiffs in this action, is reasonable in light of the purposes of the property and is viewpoint neutral. It is clear to this Court, however, that Plaintiffs have not at this preliminary stage demonstrated a clear likelihood of success on the merits or irreparable injury, nor have Plaintiffs demonstrated that the balance of hardships tips decidedly in their favor on grounds of free expression when compared with the obviously strong interest of the First Judicial District Court in maintaining a safe and orderly environment within the courthouse which is equally fundamental to the court's ability to accord to all persons[ ] due process, equal protection of the law, and a fair trial." The court held that the evidence in the record did "not support a factual finding that Defendants are excluding individuals from the courtrooms or courtroom floors of the courthouse on the basis of a viewpoint expressed, but rather on an arguably proper subject matter basis." The court also rejected Appellants' arguments that the Rules are unconstitutionally vague and overbroad, finding "no sufficient evidence in the record from which it [could] 'predict' or 'assume' that [the arguably vague Rules] are either used or intended to be used for the purpose of excluding entry of persons to the Carson City Courthouse."

Appellants appeal the denial of their motion for a preliminary injunction.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1292. We will reverse a denial of a preliminary injunction where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See Desert Citizens Against Pollution v. Bisson,* 231 F.3d 1172, 1176 (9th Cir.2000). Where, as here, the district court's ruling

---

**2.** Rules 2 and 5 are not challenged in this     case.

rests solely on a premise of law and the facts are either established or undisputed, our review is *de novo*. *See A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013(9th Cir.2001); *see also Gorbach v. Reno*, 219 F.3d 1087, 1091 (9th Cir.2000) (en banc). We are required to determine "whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the case." *A & M Records*, 239 F.3d at 1013 (internal quotation and citation omitted).

### III. Analysis

■■■ "Preliminary injunctive relief is available to a party who demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *A & M Records*, 239 F.3d at 1013(internal quotation omitted). Each of these two formulations requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties. We have held that "[t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* (internal citation and quotation omitted); *see also Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) ("These two alternatives represent extremes of a single continuum, rather than two separate tests." (internal quotation omitted)). If the movant "has a 100% probability of success on the merits," this alone entitles it to reversal of a district court's denial of a preliminary injunction, without regard to the balance of the hardships. *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir.1998). Additionally, "[i]n cases where the public interest is involved, the district

court must also examine whether the public interest favors the plaintiff." *Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.1992). We examine each of these elements—the probability of success on the merits, the balance of the hardships, and the public interest—in turn.

### A. Probability of Success on the Merits

Appellants contend that the Rules run afoul of the First Amendment's requirements of reasonableness and viewpoint neutrality, and that the Rules are also impermissibly overbroad and vague. Because, we hold that Appellants have demonstrated a probability of success on the first basis, we do not reach the questions of overbreadth and vagueness.

■■■ In assessing a First Amendment claim relating to speech on government property, the first step is to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see also Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir.2001). If the forum is public, "speakers can be excluded ... only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439. If the forum is nonpublic, a more lenient standard applies, and the government may restrict access "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's view." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)) (alteration in original); *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct.

2510, 132 L.Ed.2d 700 (1995); *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

■ This circuit has never explicitly addressed the question of whether judicial and municipal complexes like the one in this case are public fora, but under the tests set forth for determining the nature of a forum, it seems clear that they are not. While public places "historically associated with the free exercise of expressive activities," such as streets, sidewalks and parks, are considered public fora, "not all publicly owned property becomes a public forum simply because the public is permitted to come and go at the site." *Jacobsen v. Bonine,* 123 F.3d 1272, 1273 (9th Cir. 1997) (citing *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). "The government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Grace,* 461 U.S. at 178, 103 S.Ct. 1702(internal quotation omitted). "It is the 'location and purpose' of the property and the government's subjective intent in having the property built and maintained, that is crucial to determining the nature of the property for forum analysis." *Jacobsen,* 123 F.3d at 1274 (quoting *United States v. Kokinda,* 497 U.S. 720, 728–30, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)). The Complex in this case was built, and is operated, for the purpose of conducting the business of the county and of the municipal and state courts. It is not, like a public street or park, the kind of public property that has "by long tradition or by governmental fiat . . . been devoted to assembly and debate." *Perry,* 460 U.S. at 45, 103 S.Ct. 948. There is no suggestion that the Complex has been "opened for use by the public as a place for expressive activity," *id.,* such that it could be considered a "designated public forum," or that it has been intentionally opened for expres-

sion by certain groups or on certain topics, such that it could be considered a "limited public forum." *See Hopper,* 241 F.3d at 1074–75.

Other courts that have considered the question have held that similar buildings are nonpublic fora. *See, e.g., Claudio v. United States,* 836 F.Supp. 1219, 1224–25 (E.D.N.C.1993) (holding that, for First Amendment purposes, the main entrance lobby of a federal building was a nonpublic forum, considering the nature of the building containing judges' chambers, courtrooms and federal agencies, the lobby's minimal compatibility with expressive activity, and the need for security); *see also Sefick v. Gardner,* 990 F.Supp. 587, 593 (N.D.Ill.1998) (accepting trial court's finding that a federal building was a nonpublic forum). The parties in this case appear to assume that the Complex is a nonpublic forum, and we agree that this is the proper categorization.

■ The Rules at issue here are aimed squarely at expressive conduct in the Complex, specifically limiting the "words," "pictures," "symbols" and "markings" that people may wear within the building. The test for determining the constitutionality of limitations on speech in a nonpublic forum (and therefore the test to be applied in determining the probability of Appellants' success on the merits for purposes of a preliminary injunction) is the two-part test set forth by the Court in *Cornelius:* Restrictions on free expression in a nonpublic forum are constitutional only if the distinctions drawn (1) are "reasonable in light of the purpose served by the forum" and (2) are "viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439.

1.  Reasonableness

■ The "reasonableness" requirement for restrictions on speech in a nonpublic forum "requires more of a showing

than does the traditional rational basis test; *i.e.*, it is not the same as establish[ing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government's police power." *Tucker v. State of California Dept. of Educ.*, 97 F.3d 1204, 1215 (9th Cir.1996) (internal quotation and citation omitted) (alteration in original). There must be evidence in the record to support a determination that the restriction is reasonable. *Id.* (citing *Searcey v. Harris*, 888 F.2d 1314, 1322(11th Cir.1989)). That is, there must be evidence that the restriction reasonably fulfills a legitimate need. The government need not choose the least restrictive alternative when regulating speech in a nonpublic forum. *See Swarner v. United States*, 937 F.2d 1478, 1482 (9th Cir.1991). "However, its failure to select simple available alternatives suggests that the ban it has enacted is not reasonable." *Tucker*, 97 F.3d at 1216(internal quotations and citations omitted).

Appellants specifically argue that Rule 3, banning "[c]lothing, attire or 'colors' which have symbols, markings or words indicating an affiliation with street gangs, biker or similar organizations," is not reasonable in light of the purpose served by the forum. It is uncontested that the Complex has a legitimate need to preserve an orderly and safe place to conduct the public's business. However, because a review of the record reveals almost no evidentiary support for an argument that this need is reasonably served by Rule 3(or by Rules 1 and 4), we agree with Appellants.

The facts of this case are similar to those in *Tucker*, in which we recently found a regulation of speech in a nonpublic forum to be unreasonable. *See* 97 F.3d at 1215. In *Tucker*, an employee of a state agency alleged that an agency rule banning the display of religious materials outside employees' cubicles or offices violated the First Amendment. The agency argued that it had a legitimate interest in preventing disharmony in the workplace and in avoiding the appearance of government endorsement of religious messages. We found those justifications unconvincing for two reasons.

First, we held that the evidence in the record simply did not show that the asserted risks were real. *See id.* There was nothing in the record to suggest that the public ever went into the office areas in question. There was also "nothing in the record to indicate that religious materials are more likely to disrupt harmony in the workplace than any other materials on potentially controversial topics[.]" *Id.* at n. 8. In that respect, we noted, the case differed significantly from *Cornelius*, "where there was evidence in the record—thousands of letters complaining about the inclusion of advocacy groups in[a] fund drive—that supported the inference that the restriction in question would serve the government's legitimate concern about disruption[.]" *Id.*

Second, we held that even if those interests had been supported by the record, "a total ban on posting religious information of any kind is an unreasonable means of obviating" such concerns. *Id.* The rule was unreasonable, not only because it targeted one kind of speech, but also because it "ban[ned] a vast amount of material without legitimate justification." *Id.* The state had "simpler and far less restrictive alternatives available to it," such as limiting postings to regulated bulletin boards or issuing a narrower order that banned only items that might reasonably convey an impression of state endorsement. *Id.* at 1216. We held "that it is not reasonable to allow employees to post materials around the office on all sorts of subjects, and forbid only the posting of religious information and materials," and thus that

the rule violated the First Amendment, even under the more lenient standards applicable to nonpublic fora. *Id.* at 1215.

Both of these principles from *Tucker* support a finding that Rule 3 is unreasonable. First, while reasonableness "must be assessed in light of the purpose of the forum and all the surrounding circumstances," *Cornelius*, 473 U.S. at 809, 105 S.Ct. 3439, there is no evidence in the record supporting a conclusion that clothing indicating affiliation with biker organizations is particularly likely to be disruptive or intimidating. Appellees submitted affidavits of a judge in the Complex and of a security officer charged with enforcing the Rule. Neither affidavit mentioned any incident involving individuals wearing biker clothing with biker symbols that gave rise to the Rule. In their brief to us, Appellees have emphasized the March 26 incident, which they argue demonstrates the problems created by the presence of individuals in biker club clothing. But Appellees concede that any disturbance that took place on that date was sparked by Appellants' assertion of their right to wear the particular clothing in the face of what they perceived as an unconstitutional policy. It was not a disturbance that demonstrates any disruptiveness inherent in the wearing of such clothing. The government may not use a conflict over the challenged regulation as evidence of circumstances giving rise to the need for that very regulation.

It is important to note, at this stage of review, that not only was there no evidence of any prior disruption, but Appellees also made no argument in the district court, either in the briefing or at the hearing on the Motion for Preliminary Injunctive Relief, that further factual development was necessary concerning the past existence or future likelihood of such disruption. Indeed, when questioned directly by the district court about the factual rec-

ord supporting the reasonableness of Rule 3, counsel for Appellees could say only that such articles of clothing "tend to incite problems in the courthouse, both in the courtroom and in the hallways." Given the lack of support in the present record for the assertion that a limitation on this clothing will serve the purported governmental interest, our holding in *Tucker* requires that we find Rule 3 unreasonable. *See A & M Records*, 239 F.3d at 1013(holding that, while reversal is not appropriate "simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case," *de novo* review is appropriate when the district court's ruling rests solely on a premise of law and the facts are either established or undisputed).

The second *Tucker* principle likewise indicates that Rule 3 is not reasonable. Appellees' asserted interests in preserving a "safe, dignified and fair environment in which to resolve disputes," in "maintaining proper order and decorum in the courtroom," and in avoiding potentially dangerous conflicts between members of various warring motorcycle clubs are clearly legitimate. However, those interests are specific to the courtroom setting and to particular (apparently hypothetical) cases involving rival organizations. Rule 3, however, does not differentiate between courtrooms and other public areas of the second and third floors, and it does not differentiate among visitors to the Complex. That is, Rule 3 is not tailored to the legitimate concerns of the Complex. As in *Tucker*, a total ban on this expressive activity, applying to a visitor to the volunteer services office or the office of the Advocate to End Domestic Violence and even to individuals who will do no more than walk in the Complex halls, is "an unreasonable means of obviating" the concerns articulated by Appellees. *Id.* at 1215. This is especially so given the far

less restrictive alternative of specific rules or orders concerning permissible clothing or behavior limited to courtrooms or limited to individuals in particular cases or circumstances. *See Zal v. Steppe,* 968 F.2d 924, 929 (9th Cir.1992) ("Under our current system, the trial judge is charged with preserving the decorum that permits a reasoned resolution of issues. Zealous counsel cannot flout that authority behind the shield of the First Amendment.").

Appellees also appear to argue that Rule 3 is a reasonable regulation of expression in the Complex because the presence of individuals with motorcycle club symbols on their clothing may offend or alarm other individuals who have a right to use the services provided in the building. Similar concerns for the sensitivities of other visitors to the Complex undergird Appellees' reasonableness arguments as to Rules 1 and 4, which ban, respectively, the use of "words, pictures or symbols which are degrading or offensive to any ethnic, racial, social or political group" and "[w]ords, pictures or symbols with clearly offensive meanings." These arguments in support of Rules 1, 3 and 4 are unavailing, under the rationale of *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

In *Cohen,* a defendant who walked through a courthouse corridor wearing a jacket bearing the words "Fuck the Draft" was convicted under a state statute prohibiting disturbing the peace by offensive conduct. The Court held that "the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense," and that those who might be offended could "avoid further bombardment of their sensibilities by averting their eyes." *Id.* at 21, 91 S.Ct. 1780. Noting that the rule "indiscriminately swe[pt] within its prohibitions all 'offensive conduct,'" the Court rejected the argument that it served to prevent the violence that could erupt when offended viewers struck back. *Id.* at 22, 91 S.Ct. 1780. That "argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless, the States may more appropriately effectuate that censorship themselves." *Id.* at 23, 91 S.Ct. 1780.

*Cohen* pre-dates the Supreme Court's articulation of its forum-based approach to First Amendment questions, and it involved an application of a broad criminal statute rather than the enforcement of rules of conduct for a single facility. But it nevertheless undermines any assertion that Rule 3 could be rendered constitutional by a governmental interest in preventing apparel that officials merely presume could "incite problems in the courthouse." It likewise undermines any argument in support of the reasonableness of Rule 1's ban on words, pictures or symbols because of their "degrading or offensive" nature and of Rule 4's prohibition of those with "clearly offensive meanings."

The same "reasonableness" rationale now set forth by Appellees was rejected by the *Cohen* Court as "plainly untenable." *Id.* at 23, 91 S.Ct. 1780. "At most," the *Cohen* Court observed, "it reflects an 'undifferentiated fear or apprehension of disturbance (which) is not enough to overcome the right to freedom of expression.'" *Id.* (quoting *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731, (1969)). Most significantly, *Cohen* stands for the proposition that even in light of the purposes of the forum, it is not reasonable to prohibit speech in courthouse hallways merely because it may offend some people's sense of decorum. "One man's vulgarity is another's lyric," the *Cohen* Court

emphasized, and "it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." *Id.* at 25, 91 S.Ct. 1780.

We therefore conclude that Appellants have demonstrated a high probability of success on the merits of their claim that Rules 1, 3 and 4 are not "reasonable in light of the purpose served by the forum."

### 2. Viewpoint Neutrality

Even if Rules 1, 3 and 4 could be found to be reasonable, at least Rule 3 does not comply with the First Amendment's requirement that regulation of speech in a nonpublic forum be viewpoint neutral. We freely admit that the Supreme Court's concept of viewpoint neutrality in First Amendment jurisprudence has not been easy to understand. As one commentator has put it, the concept has been "confusing in both definition and application, and has been selectively applied in many contexts." Marjorie Heins, *Viewpoint Discrimination,* 24 Hastings Const. L.Q. 99, 103 (1996). The difficulty largely results from an elusive distinction drawn in the caselaw between discrimination on the basis of subject matter and discrimination on the basis of viewpoint.

In a traditional or designated public forum, restrictions on expression based on subject matter are subject to strict scrutiny under a compelling state interest test. *See Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. By contrast, in a nonpublic forum, the government may restrict access based on subject matter if doing so is reasonable, so long as it does not discriminate among viewpoints within subject matter areas. As the Court held in *Cornelius:*

> Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of

the purpose served by the forum and are viewpoint neutral. Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

*Id.* at 806, 105 S.Ct. 3439 (internal citations omitted).

Rule 3 excluded Appellants from the forum because their clothing indicated affiliations with biker organizations. The parties dispute whether the rule draws its lines of inclusion and exclusion based on the larger (and permitted) category of "subject matter" or the smaller (and forbidden) subcategory of "viewpoint." On the one hand, Appellees argue that Rule 3 is a constitutionally appropriate restriction on the subject-matter class of wearers of "symbols, markings or words indicating an affiliation with ... biker or similar organizations." Within that subject-matter category, they argue, no distinctions are made as to viewpoints; that is, all biker and similar organizations are excluded. On the other hand, Appellants argue that the appropriate subject-matter class is people who wish to visit the Complex. Such people might belong to a wide variety of clubs and organizations, not limited to biker organizations. That Appellants' expression of their connection with a particular group is singled out, they argue, demonstrates that Rule 3 discriminates on the basis of viewpoint.

■■■ Even though the line between subject and viewpoint is "a difficult one to draw," *Tucker,* 97 F.3d at 1216, we are not entirely without guidance. Two specific

considerations inform our inquiry. First, we know from *Cornelius* that we must be guided by considerations of whether the limitations on expressive activity reflect a true incompatibility between the activity and the forum. *See Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439(describing acceptable subject-matter discrimination as the exclusion of a speaker who "wishes to address a topic not encompassed within the purpose of the forum" or who "is not a member of the class of speakers for whose especial benefit the forum was created"). Our cases have recognized that, where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint rather than a subject matter. *Compare Metro Display Advertising, Inc. v. City of Victorville*, 143 F.3d 1191 (9th Cir.1998) (finding unconstitutional viewpoint discrimination in city's refusal to renew contract with lessor of bus shelter advertising space after lessor's refusal to remove pro-union advertisements from the shelter, because act was clearly aimed at the message the speech conveyed) *with Children of the Rosary v. City of Phoenix*, 154 F.3d 972 (9th Cir.1998) (holding city's ban on all noncommercial advertising on municipal buses was reasonable and viewpoint neutral in light of city's interests in maintaining neutrality and preventing a reduction in income earned from selling advertising space). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message [or] its ideas." *Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Thus, even where a proffered justification for regulating a nonpublic forum is facially reasonable, the justification cannot save a regulation "that is in fact based on the desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812, 105 S.Ct. 3439; *see also Perry*, 460 U.S. at 46, 103 S.Ct. 948(emphasizing that a regulation must not be "an effort to suppress expression merely because public officials oppose the speaker's view"). If the evidence reflects that this is the motivation or intent of the government in enacting the regulation, the regulation is viewpoint discriminatory.

Second, as the Seventh Circuit has noted, because "classifying a particular viewpoint as a subject rather than a viewpoint *on a subject* will justify discrimination against the viewpoint," courts must carefully scrutinize such classifications. *Grossbaum v. Indianapolis–Marion Cty. Bldg. Auth.*, 100 F.3d 1287,.1298 (7th Cir. 1996) (emphasis in original). Specifically, courts must be wary of attempts to manipulate the line between subject and viewpoint by claiming that a regulation operates at a higher (and more appropriate) level of generality than it actually does. Appellees' arguments in support of Rule 3 illustrate such a claim. Rule 3 singles out bikers and members of "similar organizations" for the message their clothing is presumed to convey. The governmental intent is plainly to target the message expressed at the "biker" level of generality. Of course, the category of all bikers can be subdivided into particular kinds of bikers, but the relevant question is whether "all bikers" is itself a subcategory of a larger subject-matter category—those who wish to wear clothing indicating an affiliation with some organization or point of view—that is the appropriate level of generality. We believe that this larger subject-matter category is the appropriate level of generality in this case. To hold otherwise would be to allow discrimination in favor of garden clubs and gun clubs (and the points of view associated with those organizations), and discrimination against biker clubs (and their associated points of view). Under Rule 3, motorcycle enthusiasts are targeted with a regulation that applies to them solely because they

choose to communicate the fact of their association with this particular kind of organization. *See, e.g., United States v. Fitzgerald*, 724 F.2d 633, 639 (8th Cir. 1983) (Arnold, J., concurring) (addressing associational rights of Hell's Angels).

"Courts do have a hard call to make when they review content-based speech regulations because the government could be shutting out some viewpoints by labeling them as subjects." *Grossbaum*, 100 F.3d at 1298. In these close cases, the first consideration—the evidenced governmental intent behind the implementation of the regulation—becomes key. *Id.* ("Motive may thus be a vital piece of evidence that courts must use to judge the viewpoint-neutrality of the regulation."). For example, if we were presented with a record of past incidents of violence or disorder specifically linked to the wearing of particular clothing, or of clothing indicating particular affiliations, we might well agree that the regulation was something other than "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. Similarly, if the forum was a government-sponsored garden show, limiting participation to members of garden clubs would not suggest an effort to suppress expression by members of other kinds of clubs. However, the record as it stands strongly suggests that, in implementing the Rules, Appellees were motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum. In the total absence of evidence of any danger produced by the speech, we can only conclude that the Rules' very specific restriction on expression in the Complex was "impermissibly motivated by a desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812–13, 105 S.Ct. 3439. We therefore hold Appellants have shown a high probability of success on the merits

of their claim that Rule 3 is impermissibly viewpoint discriminatory.

### 3. Summary

If we knew that the record in this case would not be supplemented, we would, based on the foregoing analysis, simply find Rules 1, 3 and 4 unconstitutional. We would not need to go on to the second step of the test for a preliminary injunction because if the probability of Appellants' success on the merits is one hundred percent, a balancing of the hardships is unnecessary. *See Baby Tam*, 154 F.3d at 1102. Nor would we need to remand for further proceedings, for by hypothesis there would be no supplementing of the record that might change the outcome.

In this case, Appellees did not argue in the district court that they needed any larger or different record than they had compiled. On the view of the case taken by the district court, Appellees were right, for they prevailed based on the existing record. However, now that we have held that, on the current record, Rules 1, 3 and 4 are unconstitutional, Appellees may wish to rethink their position. The district court will be in the best position to determine whether the Appellees should be allowed to supplement the record, and we will remand to allow it to make that determination. Because, at this stage of the litigation, we cannot say that the district court will forbid Appellants to supplement the record, and we cannot say that a supplemented record will necessarily result in another holding of unconstitutionality, we do not say that the Appellants have demonstrated a one hundred percent possibility of success on the merits.

We do hold, however, that at this stage of the proceedings Appellants have demonstrated at least a high probability of success on the merits. Where plaintiffs seeking a preliminary injunction demonstrate a

high probability of success on the merits, they need demonstrate only the possibility of irreparable harm as part of the balancing of the hardships. *See Bernard v. Air Line Pilots Ass'n, Int'l.,* 873 F.2d 213, 217(9th Cir.1989) ("Where a party can show a strong chance of success on the merits, he need show only a possibility of irreparable harm."). We now turn to the question of irreparable harm and the balance of the hardships.

## B. Irreparable Harm and the Balance of the Hardships

The district court rejected Appellants' arguments that the balance of the hardships tips in their favor and that the failure to enjoin enforcement of the Rules will cause them irreparable injury. It emphasized "the obviously strong interest of the First Judicial District Court in maintaining a safe and orderly environment within the courthouse, which is equally fundamental to the court's ability to accord to all persons[ ] due process, equal protection of the law, and a fair trial." Appellees argue to us that the banned clothing "tends to create interference or disruption with the orderly administration of justice" and that the harm that would be done by an injunction against the enforcement of the Rules outweighs any inconvenience that Appellants might suffer.

As discussed above, there is insufficient evidence in the current record to support the argument that Appellants' clothing will, in fact, cause such interference or disruption. We agree with Appellees that the interest in keeping a government building accessible and safe is both legitimate and significant. But absent a showing in the record of actual (or realistic threat of) interference or disruption, the demonstrated hardship imposed upon Appellees by the barring of enforcement of the Rules is minimal. This is especially so given the continuing ability of the individual judges to maintain decorum in their courtrooms or in particular cases, which is not at issue in this case.

On the other side of the equation, Appellants have shown that irreparable injury to their protected interests will occur if the relief is *not* granted. The Supreme Court has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148(9th Cir.1998) (holding that a civil liberties organization that had demonstrated probable success on the merits of its First Amendment overbreadth claim had thereby also demonstrated irreparable harm). The district court refused to assume the existence of this injury because it found that Appellants had not "clearly established" that their First Amendment rights had been violated. However, even if the merits of the constitutional claim were not "clearly established" at this early stage in the litigation, the fact that a case raises serious First Amendment questions compels a finding that there exists "the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [Appellants'] favor." *Viacom Int'l, Inc. v. FCC,* 828 F.Supp. 741, 744(N.D.Ca.1993). "Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Id.* (citing *San Diego Committee v. Governing Board,* 790 F.2d 1471 (9th Cir.1986)). Because the test for granting a preliminary injunction is "a continuum in which the required showing of harm varies inversely with the required showing of

meritoriousness," when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness. *See San Diego Committee,* 790 F.2d at 1473 n. 1.

We therefore hold that Appellants have demonstrated that they would experience irreparable harm if the preliminary injunction is denied, and that this harm is much more serious than the hardship Appellees have shown they would endure if the injunction were granted. *See Ebel v. City of Corona,* 698 F.2d 390, 393 (9th Cir.1983).

## C. The Public Interest

Finally, our precedent requires that we examine the public interest in determining the appropriateness of a preliminary injunction. While we have at times subsumed this inquiry into the balancing of the hardships, *see, e.g., Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988), it is better seen as an element that deserves separate attention in cases where the public interest may be affected. *See Fund for Animals v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992); *see also Westlands Water Dist. v. Natural Resources Defense Council,* 43 F.3d 457, 459 (9th Cir.1994) ("If the public interest is involved, the district court must also determine whether the public interest favors the [movant].").

■■■ The public interest inquiry primarily addresses impact on non-parties rather than parties. The potential for impact on nonparties is plainly present here. Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles. *See Homans v. Albuquerque,* 264 F.3d 1240, 1244 (10th Cir.2001) ("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment

right of political expression."); *Iowa Right to Life Comm'e, Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir.1999) (finding a district court did not abuse its discretion in granting a preliminary injunction because "the potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms"); *Suster v. Marshall,* 149 F.3d 523, 530 (6th Cir.1998) (holding candidates for judicial office were entitled to preliminary injunction of expenditure limit given likelihood of success on the merits, irreparable harm and lack of public interest in enforcing a law that curtailed political speech); *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir.1997) (stating, in context of a request for injunctive relief, that "[t]he public interest ... favors plaintiffs' assertion of their First Amendment rights"); *G & V Lounge, Inc. v. Mich. Liquor Control Com'n,* 23 F.3d 1071, 1079 (6th Cir.1994) (noting "it is always in the public interest to prevent the violation of a party's constitutional rights"); *Cate v. Oldham,* 707 F.2d 1176, 1190 (11th Cir.1983) (holding the "strong public interest in protecting First Amendment values" favored preliminary injunctive relief). The ongoing enforcement of the potentially unconstitutional regulations at the Complex would infringe not only the free expression interests of the dozen Appellants in this case, but also the interests of other people who may wish to enter the Complex.

The public interest in maintaining a free exchange of ideas, though great, has in some cases been found to be overcome by a strong showing of other competing public interests, especially where the First Amendment activities of the public are only limited, rather than entirely eliminated. *See, e.g., Hale v. Dep't of Energy,* 806 F.2d 910, 918 (9th Cir.1986) (finding plaintiffs' First Amendment claim did not outweigh government's interests in safety and

security of nuclear testing site); *but compare United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg. Transit Authority*, 163 F.3d 341, 363–64 (6th Cir.1998) (holding that the public interest that would be served by granting preliminary injunction requiring transit authority to accept union's proposed bus advertisement outweighed any public interest to be served by denial, given that authority failed to show that public interest in safe and efficient transportation would be affected, while denial would harm public's interest in protecting First Amendment rights and allowing the free flow of ideas). Appellees argue that the "public interest in a safe, dignified and fair environment in which to resolve disputes" constitutes such a competing interest and justifies the denial of injunctive relief here. However, as already discussed, Appellees have made virtually no factual showing, on the current record, to support the claimed need for the Rules as they are now written. There has been no showing that regulation of biker clothing in hallways and other non-courtroom areas of the Complex can plausibly be justified by the need to protect the courtroom environment itself. However, we emphasize again that permissible regulation within the courtrooms, and with respect to particular cases or circumstances, is not at issue in this case, and that our holding in this case is directed only at the policies and Rules that generally regulate behavior in the non-courtroom areas of the Complex.

### Conclusion

Our examinations of Appellants' probability of success on the merits, the balance of the hardships, and the public interest lead us to conclude that Appellants have a right to preliminary injunctive relief. Accordingly, the district court's order denying such relief is

REVERSED and this case is REMANDED for further proceedings consistent with this opinion.