**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EAGLE POINT EDUCATION ASSOCIATION/SOBC/OEA; DAVE CARRELL; STACI BOYER,
*Plaintiffs-Appellees*,

v.

JACKSON COUNTY SCHOOL DISTRICT NO. 9,
*Defendant-Appellant.*

Nos. 15-35704
15-35972

D.C. No.
1:12-cv-00846-CL

OPINION

Appeals from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted October 10, 2017
Gonzaga University, Spokane, Washington

Filed January 26, 2018

Before: Susan P. Graber, Richard A. Paez,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

**SUMMARY**[*]

## Civil Rights

The panel affirmed the district court's summary judgment and attorney's fee award in favor of plaintiffs in their action brought under 42 U.S.C. § 1983 and state law challenging the policies of a public school which prohibited, among other things, picketing on school district property, and prohibited strikers from coming onto school grounds, even for reasons unrelated to an anticipated teachers' strike.

The panel first rejected the school district's assertion that the policies enacted by the district during a teacher's strike should be viewed as "government speech" by the school district itself and therefore should not be judged as restrictions on the free speech rights of teachers or students. The panel stated that this argument reflected a fundamental misunderstanding of the government speech doctrine. The panel held that no reasonable observer would have misperceived the speech which the district sought to suppress—speech favoring the teachers' side in the strike—as a position taken by the school district itself. The panel held that the government speech doctrine does not authorize the government's suppression of contrary views.

The panel held that because the school district's policies were not government speech but were instead restrictions on private speech, the First Amendment's Free Speech Clause was implicated. Determining that the policies were neither

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reasonable nor viewpoint neutral, the panel held that they failed even the non-public forum test. The policies therefore violated plaintiffs' First Amendment rights and their rights under the Oregon Constitution. The panel further held that the school district was liable for the action of its security officer who barred a student from the school parking lot because she had a sign on her car which supported the teachers. Because the panel affirmed the district court's judgment, it also affirmed the award of attorney's fees and costs to plaintiffs, as the prevailing parties.

## COUNSEL

Peter R. Mersereau (argued) and Thomas W. McPherson, Mersereau Shannon LLP, Portland, Oregon, for Defendant-Appellant.

Jason Walta (argued), National Educational Association, Washington, D.C.; Margaret S. Olney, Henry J. Kaplan, and Thomas K. Doyle, Bennett Hartman Morris & Kaplan LLP, Portland, Oregon; for Plaintiffs-Appellees.

## OPINION

CLIFTON, Circuit Judge:

In anticipation of a teachers' strike, a public school district adopted policies that prohibited picketing on property owned or leased by the school district, prohibited strikers from coming on school grounds, even for reasons unrelated to the strike, and prohibited signs and banners at any facilities owned or leased by the school district without advance

written approval by the district superintendent. The policies were motivated by the strike, and they were formally rescinded shortly after the strike ended. The union, one of its members, and a student filed a civil rights action against the school district under 42 U.S.C. § 1983, contending that the district infringed on their First Amendment rights. The district court granted summary judgment in favor of Plaintiffs and subsequently awarded them attorney's fees and costs.

The school district appeals, primarily arguing that the policies enacted by the district during the teachers' strike should be viewed as "government speech" by the school district itself and should not be judged as restrictions on the free speech rights of teachers or students. That argument reflects a fundamental misunderstanding of the government speech doctrine. No reasonable observer would have misperceived the speech which the district sought to suppress—speech favoring the teachers' side in the strike—as a position taken by the school district itself. The government speech doctrine does not authorize the government's suppression of contrary views. We affirm.

## I.   Background

Defendant-Appellant Jackson County School District No. 9 ("the District") is a public school district located near Medford, Oregon. Plaintiff-Appellee Eagle Point Education Association/SOBC/OEA ("the Union") is a labor organization representing employees of the District, including both teachers and staff members. Plaintiff-Appellee Dave Carrell was at the relevant time acting president of the Union and an employee of the District. Plaintiff-Appellee Staci Boyer was then a student in the District's high school. The strike which lies behind this action took place in May 2012.

In anticipation of that strike, the District adopted two resolutions on May 2, 2012. One of those resolutions, identified as the Resolution on Picketing, provided that "[n]o picketing will be allowed on any district property or facilities owned or leased by the District" and that "[p]icketers are prohibited from entering school facilities for any reason whatsoever." The policy was not limited to property used specifically for instructional purposes. At about the same time, the District entered into a three-month lease for a vacant lot across the street from school district headquarters that had been used by the Union in the past for organizing. After renting the lot, the District notified the Union that it could not use that lot.

The other resolution, the Resolution on Signs and Banners, provided that "[s]igns and banners will not be allowed in or upon buildings and other facilities unless written approval of the Superintendent is obtained in advance." By its terms, it was not limited to locations used for instruction either, but applied to "any and all other facilities owned or leased by the District."

At about the same time, the District sent a "Check-Out Notification Letter" to members of the Union. That letter informed recipients that they would "not be permitted on school property during the strike." Union members were required to sign a statement in which they agreed not to enter school property during the strike. The District informed its staff that "[a] parent who is a striking teacher shall not visit his/her child on any day in which they are participating in the picket line." (The two Resolutions, the Check Out Notification Letter, and the requirement to sign the statement will collectively be referred to as "the District policies.")

The Union went on strike on May 8, 2012. The District enforced the policies. Use of the newly rented vacant lot across the street from the District administrative office was prohibited. District security personnel directed picketers to stay off District property, including gravel by the side of a public roadway adjacent to an elementary school and areas that were not cordoned off either before or after the strike. Striking employees were prohibited from entering school grounds, even for reasons unrelated to picketing. Plaintiff Carrell testified that he was turned away by a security guard when he tried to attend a weekend flower sale at the high school.

Plaintiff Boyer, then a high school senior, drove into the school parking lot on May 11, 2012, with a sign on the back windshield of her car that stated "I Support D9 Teachers." A District security guard prohibited her from parking in the lot. An assistant principal at her school explained to her that signs supporting teachers or "protesting" were forbidden.

After another student posted a picture of her pet on Facebook with a sign that said "Strike Dog," the principal of the high school sent an email to the same assistant principal identifying that student by name, along with three others, stating that "students that have posted negativity on Facebook" should be "inform[ed] . . . that they are not coming to school on Monday."

The strike ended, and Union members returned to work on May 17, 2012, after the Union and the District reached a tentative agreement. The District rescinded the Resolutions on June 13, 2012.

Prior to the strike, the District had policies regulating use of school grounds. It nonetheless officially encouraged parental school visits and the use of school facilities for civic and recreational purposes. School-sponsored events were permitted on school grounds without a permit, including charitable fund-raising, confidential pregnancy counseling, and an annual Mother's Day weekend plant sale.

Plaintiffs filed suit against the District on May 14, 2012, alleging that the District policies violated their free speech rights under the First Amendment and the Oregon Constitution. The parties later filed cross-motions for summary judgment. The court granted Plaintiffs' motion for summary judgment and denied the District's motion.

A judgment was entered on August 18, 2015, declaring that the District violated Plaintiffs' free speech rights under the First Amendment of the United States Constitution and under Article I, section 8 of the Oregon Constitution, enjoining the District from re-enacting the resolutions and policies declared unlawful, and awarding Plaintiffs nominal damages in the amount of $100. The District timely appealed.

Plaintiffs petitioned for an award of attorney's fees and costs, and the parties stipulated to the amount of $150,000. The District reserved the right to challenge on appeal Plaintiffs' entitlement to such an award. The court entered a Stipulated Judgment for Attorney Fees and Costs on November 29, 2015. The District timely appealed.

This court consolidated the two appeals filed by the District.

## II. Discussion

We review a district court's ruling on cross-motions for summary judgment de novo. *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 930 (9th Cir. 2008).

### A. Government Speech

The primary argument presented by the District is that its policies were a form of government speech. If the policies were government speech, then they would not be subject to the Free Speech Clause. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). On the other hand, if the policies were instead regulatory policies restricting private speech on government property, then the Free Speech Clause would apply and the policies would be subject to a "forum analysis." *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) ("We have previously used what we have called 'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property.").

The District's argument stretches the government speech doctrine beyond logical bounds, however. The District was entitled to make its own position known, and it did, but the doctrine did not give the District leave to suppress speech by others.

The starting point in applying the government speech doctrine is to establish that the action in question was in fact something that should be treated as a statement by the

government. Two recent Supreme Court decisions, *Summum* and *Walker*, illustrate the doctrine.

In *Summum*, the Supreme Court held that the First Amendment rights of a religious organization were not violated by a city's denial of its request to erect a monument in a city park. 555 U.S. at 481. The 2.5 acre park located in the historic district of Pleasant Grove, Utah, had 15 permanent displays, at least 11 of which were donated by private groups or individuals. The displays included a historic granary, a wishing well, the City's first fire station, a September 11 monument, and a Ten Commandments monument donated by the Fraternal Order of Eagles in 1971. Summum was a religious organization that requested permission to erect a "stone monument," which would contain "the Seven Aphorisms" of its faith and would be similar in size and nature to the Ten Commandments monument*.* The city denied the request. *Id.* at 464–65.

The Court rejected the argument that the city's denial violated Summum's First Amendment rights. It noted that "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech, but this case does not present such a situation. Permanent monuments displayed on public property typically represent government speech." *Id*. at 470. That the monument may have been donated by a private party did not alter the conclusion. "[B]ecause property owners typically do not permit the construction of such monuments on their land, persons who observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf. In this context, there is little chance that observers will fail to appreciate the identity of the speaker." *Id*. at 471.

In sum, the focus was on whether a reasonable observer would view the statement made by the monument to be a statement by the government. The Court concluded that an observer of Summum's proposed monument would reasonably understand it to convey a message on the part of the city. Under the government speech doctrine, the city was permitted to decline to make such a statement.

Similarly, in *Walker*, the Court held that the Texas Department of Motor Vehicles Board did not violate the free speech rights of the Sons of Confederate Veterans when it denied that organization's application for a specialty license plate featuring the Confederate battle flag. 135 S. Ct. at 2253. The state authorized the issuance of a variety of different specialty plates, for an annual fee. The state legislature authorized certain plates and the Board itself approved others, including plates requested by private individuals and organizations. The Court concluded that specialty license plates conveyed government speech, so the state could refuse to issue the requested plate. *Id*. at 2246. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Id*. at 2245.

The debate in that 5-4 decision was whether a reasonable observer would perceive the plate's message as a statement by the State of Texas. The dissent described the large variety of plates that were available and asked, rhetorically: "As you sat there watching these plates speed by, would you really think that the sentiments reflected in these specialty plates are the views of the State of Texas and not those of the owners of the cars?" *Id*. at 2255 (Alito, J., dissenting). The dissenters thought the answer to the question was "No." In contrast, the majority concluded that the plate's message amounted to government speech which the Board was empowered to

control, noting that license plates "long have communicated messages from the States," *id*. at 2248 (majority opinion), that plate designs "are often closely identified in the public mind with the State," *id*. (internal quotation marks and brackets omitted), and that "a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message," *id*. at 2249.

There is no counterpart in this case to the park monument or specialized license plate at issue in *Summum* and *Walker*. The District argues that "[t]he District's official position . . . that it could not accede to the demands made by the Union . . . . was quintessentially 'government speech.'" But nobody contested the District's ability to express its position. The issue is whether the District could, through the policies at issue, limit the ability of Plaintiffs to express their views. The government speech doctrine would be relevant to those policies only if observers might reasonably have concluded that the District itself endorsed the pro-strike positions which Plaintiffs sought to express. Stated in the words of *Summum*, the question is "whether a government entity is speaking on its own behalf or is providing a forum for private speech." 555 U.S. at 470.

Here, unlike in *Summum* and *Walker*, a reasonable observer would not think that the pro-strike message of the strikers or their supporters was a statement made or endorsed by the District. The District superintendent acknowledged that the "activities engaged in by strikers. . . were obviously

not sponsored by the District." A reasonable observer would have understood that.[1]

Indeed, the District has not actually argued that anyone would have misunderstood Plaintiffs' pro-strike message as a statement by the District. The most that the District argues is that it would have sent

> a garbled message to parents and taxpayers by allowing the striking teachers access to school property to picket, chant, and display . . . signs and banners denouncing the District's official policy. Reasonable observers would have doubted the resolve of the School District and suspected that administrators of particular schools were allowing the picketers access [to] school property because they themselves openly or covertly disagreed with the District's collective bargaining position.

None of that supports treating the enforcement of the District policies here as government speech. The answer to the concern that observers might doubt the resolve of the District is found in the First Amendment itself. It protects the expression of views that disagree with the government. Even "high school students can appreciate the difference between

---

[1] We note that the District itself did not immediately recognize the policies in dispute here to be justified as speech by the District itself. In its first memorandum in connection with the motions for summary judgment, the District did not contend that its action was covered by the government speech doctrine. That argument first arose during oral argument. That delay does not mean that the District waived the argument, but its own failure to perceive the policies as "government speech" cuts against any claim that a reasonable observer would view it as such.

speech a school sponsors and speech the school permits because legally required to do so." *Rumsfeld v. Forum for Acad. & Instit. Rights, Inc.*, 547 U.S. 47, 65 (2006).

The District's position would authorize any government to block the expression of views on government property that did not match the government's own favored position, out of fear that the government's "resolve" might be questioned. The government speech doctrine has not so swallowed the First Amendment. In *Summum*, the Court noted that "[w]hile government speech is not restricted by the Free Speech Clause, the government does not have a free hand to regulate private speech on government property." *Summum*, 555 U.S. at 469. Because the speech restricted by the District policies would reasonably have been recognized as speech by Plaintiffs and their allies, not the District's own speech, it is subject to the First Amendment.

## B.  Forum Analysis

Because the District's policies were not government speech but were instead restrictions on private speech, the First Amendment's Free Speech Clause is implicated. The District policies applied to actions on property owned or leased by the District. It argues that it, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). There is no doubt that the District had a legitimate interest in keeping its schools open and in avoiding disruption of its mission to educate students.

That does not end the discussion, however. It has long been established that teachers and students have First

Amendment rights. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Plaintiffs contend that the District violated their First Amendment rights.

Ordinarily, in considering speech restrictions on government property, we start by looking at the place where the restrictions apply. "[T]he extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). Government property is generally divided into three categories: public fora, designated or limited public fora, and non-public fora. *Flint v. Dennison*, 488 F.3d 816, 830–31 (9th Cir. 2007).

The district court assumed that the property covered by the District policies was a non-public forum, where the government has the greatest authority to restrict speech. Because it concluded that the District policies violated the First Amendment even under the non-public forum standard, it did not need to determine which forum standard applied. We follow the same approach and also assume that the locations covered by the District policies were non-public fora.

Speech in a non-public forum can be restricted, but the restrictions must be (1) "reasonable" and (2) "not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (quoting *Perry*, 460 U.S. at 46); *cf. Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 189 (2007) (explaining that restrictions on speech in a non-public forum are permissible if they are

"reasonable in light of the purpose served by the forum" and "viewpoint neutral"). The District acknowledges as much. The District policies do not satisfy either requirement, however.

To support the position that the restriction is reasonable, there must be evidence that the restriction reasonably fulfills a legitimate need. *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966–67 (9th Cir. 2002), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The government need not choose the least restrictive alternative when regulating speech in a non-public forum. However, its failure to select simple available alternatives suggests that the ban it has enacted is not reasonable." *Id*. at 967 (citation and internal quotation marks omitted); *see Tucker v. Cal. Dep't. of Educ*., 97 F.3d 1204, 1216 (9th Cir. 1996).

The district court concluded that the District policies were not reasonable. Although the District argues that its action was required to keep the schools operating normally, it does not directly challenge the district court's determination that there was no evidence that the policies were actually needed to prevent disruption. Notably, the district court concluded that "school administrators had no indication of potential violence, disruption, or other potential harm to students or teachers or members of the public, which might have justified their actions." The District did not demonstrate that school officials actually "anticipated that signs or banners would cause substantial disruption of or material interference with school activities." The District failed to show "how signs and banners would have a harmful impact on actual operation of the schools [or] how the blanket ban would alleviate such harms." And, the district court concluded, "the restrictions in

the Picketing Resolution and the Check-Out Notification Letter have nothing to do with education of students. For instance, restrictions are not based on a certain time of day when picketing would disturb classes, or certain areas of school property that would be out of sight for students or otherwise less distracting."

Our review of the record leads us to the same conclusions. The District did not submit evidence sufficient, even by the standards applicable to summary judgment, to justify its sweeping prohibitions. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972) (quoting *Tinker*, 393 U.S. at 508). The District may have had a genuine concern for keeping the schools open, but a generalized fear of "disruption" is not enough. The District needed "reasonable ground to fear" that some disruption would occur. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring)). Evidence of that was missing.

The district court also concluded that the policies were not viewpoint neutral. The purpose behind a challenged restriction is the "threshold consideration" in deciding whether a policy is appropriately neutral. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994). "Viewpoint discrimination . . . occurs when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction . . . ." *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) (internal quotation marks omitted). "[W]here the government is plainly motivated by the nature of the message rather than the

limitations of the forum or a specific risk within that forum, it is regulating a viewpoint rather than a subject matter." *Sammartano*, 303 F.3d at 971. "[E]ven where a proffered justification for regulating a non public forum is facially reasonable, the justification cannot save a regulation 'that is in fact based on the desire to suppress a particular point of view.'" *Id.* (quoting *Cornelius*, 473 U.S. at 812).

Even viewing the evidence in the light most favorable to the District, there was no issue of material fact as to the motivation behind the policies. They were enacted because of the impending strike and were rescinded after the strike ended. The District superintendent acknowledged that "[t]he purpose of the resolution—the reason we passed resolutions on these particular dates . . . is that we believed that we were going to have an employee strike." More than simply avoiding disruption from the strike, the District sought specifically to restrict pro-Union speech. As the District itself argued to us, it wanted to avoid sending "a garbled message to parents and taxpayers by allowing the striking teachers access to school property to picket, chant, and display . . . signs and banners denouncing the District's official policy." The District policies were directly aimed at stifling disagreement with the District's position.

The overbreadth of the District policies further demonstrates that they were designed to do more than prevent disruption of classes. If that had been the goal of the policies, they need not have covered all District property (even the leased vacant lot across from the District offices, where instruction did not take place), targeted all signs (even non-inflammatory ones), prohibited all strikers from entering campus (even to pick up children), or applied at all times, including after school hours (even to prevent a striker from

attending a flower show on the weekend). The desire of the high school principal to require students who expressed support for the strike—described as "students that have posted negativity on Facebook"—to miss a day of school was a telling demonstration of the desire to suppress dissent even at the expense of instruction.

Because the District policies were neither reasonable nor viewpoint neutral, they fail even the non-public forum test. We need not reach the issue of whether all school property was a non-public forum for free speech purposes. The District policies violated the First Amendment rights of Union members.

## C.  The Restriction on Student Speech

The District does not defend the action of its security officer in barring Plaintiff Boyer, at the time a student in the District high school, from the school parking lot because she had a sign on the back windshield of her car that stated "I Support D9 Teachers." It acknowledges that, as a student, Boyer had a right to be on school property and also had a right to express her opinions in a non-disruptive manner. The District does not contend that her sign was disruptive.

Instead, the District attempts to avoid responsibility for the violation of her rights by arguing that the restriction imposed on Boyer was not an application of the District policies. Specifically, it contends that Boyer was a victim of the security guard's own decision, not of the Resolution on Signs and Banners. That argument is not persuasive.

There is no suggestion that the security officer would have taken any action but for the adoption and enforcement

of the policies. The policies might not have clearly spelled out how far the prohibition on signs extended, but the application of the Resolution on Signs and Banners by the security guard was by no means an implausible interpretation. Though the District argues that the policy by its terms applied only "in or upon buildings and other facilities" of the District, not to the parking lot, the District itself broadly extended the reach of its prohibitions to the vacant lot across from its offices. It was not illogical for the security officer similarly to treat the parking lot as a school "facility." Moreover, at the time of the incident, the high school's assistant principal did not tell Boyer that the guard had made a mistake. He told her that signs supporting teachers or "protesting" were forbidden.

As a result, the District was properly held liable because "implementation of its official policies or established customs inflict[ed] the constitutional injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 708 (1978). The District's liability did not arise "*solely* because it employ[ed] a tortfeasor." *Id*. at 691. This is not an application of respondeat superior. *See id*. Rather, the District is liable because its Resolution on Signs and Banners caused the harm inflicted on Boyer.

## D.  The Oregon Constitution Claims

In addition to finding a violation of the First Amendment, the district court concluded that the District violated Plaintiffs' rights under the Oregon Constitution, which prohibits state actors from "restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever." Or. Const. art. I., § 8. Speech regulations "that focus on the *content* of speech or writing," with some exceptions that do not apply here, violate the

Oregon Constitution. *State v. Plowman*, 838 P.2d 558, 562 (Or. 1992) (citing *State v. Robertson*, 649 P.2d 569, 579 (Or. 1982)).

At the threshold, the District argues that federal courts lack subject matter jurisdiction over the Oregon Constitution claims because the Oregon Employment Relations Board ("ERB") has exclusive jurisdiction over those claims. The ERB has exclusive jurisdiction over unfair labor practice claims, but it does not have exclusive jurisdiction over all claims by employees against their employers.

The "ERB has exclusive jurisdiction to determine whether an unfair labor practice has been committed." *Ahern v. Or. Pub. Emps. Union*, 988 P.2d 364, 368 n.4 (Or. 1999). If resolving the complaint does not require determining whether an unfair labor practice has occurred, it does not thereby create a danger of "inconsistent rulings about what acts may constitute an unfair labor practice." *Id.* at 368 (holding that the ERB's exclusive jurisdiction is a way to prevent inconsistent rulings about which acts constitute unfair labor practices). Plaintiffs' allegation that their free speech rights under the Oregon Constitution were violated does not require determining whether an unfair labor practice occurred. The claim before us is not contingent on labor laws. Because the resolution of Plaintiffs' claims does not risk an inconsistent ruling on which acts constitute unfair labor practices, those claims fall outside the scope of the ERB's exclusive jurisdiction and may be pursued in the current action.

Regarding the merits, for reasons already discussed, we agree with the district court that the District policies focused on the content of speech. Speech regulation adopted because of government disagreement with the speech's message is

content-based even if the regulation is facially content neutral. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).

The District argues that because Oregon law designates school land for educational purposes, "constitutional rights must be applied in a manner that accommodates" those purposes. It contends that schools may restrict access to their property in order to preserve the educational purposes of schools. Merely asserting a right to protect schools' educational aims does not shield regulation from constitutional concerns, however. Those regulations must still be "content-neutral regulations of speech that are imposed for reasons of public safety, aesthetics, or other important public purposes." *State v. Carr*, 170 P.3d 563, 568 (Or. Ct. App. 2007) (citing *Outdoor Media Dimensions, Inc. v. Dep't of Transp.*, 132 P.3d 5, 11–12 (Or. 2006)).

The District policies did not meet these requirements. They were not viewpoint neutral, let alone content neutral. Moreover, they were not imposed simply to preserve educational purposes; they were imposed because the District opposed the Union's position. Because the District policies were neither reasonable nor content neutral, they violated Plaintiffs' rights under the Oregon Constitution.

### E.  Attorney's Fees and Costs

Neither party contests the reasonableness of the amount of attorney's fees and costs awarded. The District objects to the award of fees and costs only on the ground that Plaintiffs should not be the prevailing parties. Because we affirm the district court judgment, Plaintiffs are the prevailing parties. We thus affirm as well the award of attorney's fees and costs.

## III.      Conclusion

We affirm the judgment of the district court that the District violated Plaintiffs' rights under the First Amendment and the Oregon Constitution.  We also affirm the award of attorney's fees and costs.

To be clear, we do not hold that a public school district or any other governmental unit is precluded from taking any action to continue operations during a strike or from imposing reasonable, viewpoint-neutral restrictions generally on access and expressive activities in a non-public forum. But restrictions on free speech rights cannot be aimed at stifling expressions of dissent,   even where—indeed, especially where—such restrictions are intended to show the government's resolve.

**AFFIRMED**.