FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

REBECCA HARTZELL, Ph.D.,
BCBA-D, wife,

    *Plaintiff - Appellant*,

  v.

MARANA UNIFIED SCHOOL
DISTRICT, a governmental entity
organized and existing under the laws
of the State of Arizona; ANDREA
DIVIJAK, in her individual capacity,
and Marital Community; JOSEPH
DIVIJAK, husband, Marital
Community,

    *Defendants - Appellees*,

and

DOVE MOUNTAIN CSTEM K-8,

    *Defendant*.

No. 23-4310

D.C. No.
4:21-cv-00062-
SHR

OPINION

Appeal from the United States District Court
for the District of Arizona
Scott H. Rash, District Judge, Presiding

Submitted October 21, 2024
Phoenix, Arizona

Filed March 5, 2025

Before: A. WALLACE TASHIMA, MILAN D. SMITH,
JR., and BRIDGET S. BADE, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### First Amendment/Schools

The panel affirmed in part and reversed in part the district court's judgment in favor of the Marana Unified School District and school principal Andrea Divijak in an action brought by Rebecca Hartzell, pursuant to 42 U.S.C. § 1983 and state law, alleging that she was banned from the premises of her children's school in retaliation for her protected speech.

The District and Divijak asserted that Hartzell was banned because of her conduct; specifically, they allege that she assaulted Divijak.

Addressing Hartzell's First Amendment retaliation claim against the District, the panel held that the district court did not abuse its discretion in excluding Hartzell's attempt to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

prove her *Monell* claim against the District based on a "final policymaker" theory because she did not adequately identify this theory in the joint pretrial statement. The panel also rejected Hartzell's *Monell* claim against the District based on a "custom or practice" theory. The panel nevertheless reversed the district court's judgment for the District on Hartzell's First Amendment retaliation claim because the District's official policy of barring speech that was "offensive or inappropriate" was unconstitutional and a reasonable jury could conclude that Hartzell was banned from the school grounds based on this policy, rather than because of her alleged assault on Divijak.

The panel affirmed the district court's holding that Divijak was entitled to qualified immunity with respect to Hartzell's First Amendment retaliation claim against Divijak. Although a reasonable jury could determine that Divijak banned Hartzell in violation of a constitutional right, that right was not clearly established given the lack of persuasive authority addressing First Amendment retaliation in light of the special characteristics of the school environment.

The panel affirmed the district court's judgment for the District on Hartzell's claim that the District violated her procedural due process right to direct the education of her children because Hartzell's ban from the school premises did not implicate her right to direct her children's education. The district court also did not abuse its discretion in denying Hartzell's motion, made two months after the district court's summary judgment ruling, to amend her First Amended Complaint to add a First Amendment theory to her procedural due process claim.

Finally, the panel reversed in part the district court's judgment in Divijak's favor on Hartzell's state law defamation claim, alleging that Divijak sent two defamatory documents to Hartzell's employer, because the defamation claim was viable to the extent it was based on one of the documents.

## COUNSEL

Jacob C. Jones (argued), Snell & Wilmer LLP, Phoenix, Arizona; Jeffrey Willis, Snell & Wilmer LLP, Tucson, Arizona; for Plaintiff-Appellant.

Lisa A. Trudinger-Smith (argued) and Tyler H. Stanton, DeConcini McDonald Yetwin & Lacy PC, Tucson, Arizona, for Defendants-Appellees.

# OPINION

M. SMITH, Circuit Judge:

Following an incident on February 7, 2020, at Dove Mountain K-CSTEM school (Dove Mountain), Plaintiff-Appellant Rebecca Hartzell was banned from the school premises. Hartzell claims that she was banned from the school in retaliation for her protected speech. Defendants-Appellees, the Marana Unified School District (the District) and Andrea Divijak, the principal at Dove Mountain, assert that Hartzell was banned because of her conduct; specifically, they allege that Hartzell assaulted Divijak. Hartzell sued the District and Divijak pursuant to 42 U.S.C. § 1983 for violations of her First Amendment and procedural due process rights. Hartzell also sued Divijak for defamation.[1]

The district court granted summary judgment in the Defendants' favor on the procedural due process claim, on the § 1983 claim against Divijak, and on the defamation claim to the extent it was based on two documents sent to Hartzell's employer. The district court also denied Hartzell's request to amend her procedural due process claim to include a First Amendment theory.

At trial, the district court precluded questioning or argument regarding Hartzell's First Amendment *Monell* claim against the District to the extent it relied on a "final policymaker" theory.[2] At the close of trial, the district court granted judgment as a matter of law in the Defendants' favor

---

[1] Hartzell also brought additional claims not relevant to this appeal.

[2] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

on the First Amendment claim against the District. The jury rejected the balance of Hartzell's defamation claim, which was the only cause of action submitted to it.

Hartzell appeals each of the district court's determinations. We reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Hartzell is the parent of eight school-aged children, five of whom attended Dove Mountain during the 2019–20 school year. Divijak was serving as the principal of Dove Mountain at that time. In August 2019, the District opened Dove Mountain, a new kindergarten through eighth grade school. Dove Mountain is a part of and run by the District.

### I. Hartzell's Advocacy

Hartzell has a master's degree in special education and a doctorate focusing on applied behavioral analysis and autism. She also became an associate professor of practice at the University of Arizona, and a director of the master's program in applied behavioral analysis at that institution.

Since approximately 2008, Hartzell has been advocating for improved services in the District. Prior to February 7, 2020, Hartzell had expressed, both orally and via e-mail, numerous concerns to District personnel, including concerns related to school event scheduling, overheated buses, children accessing pornography on school computers, the availability of books in the school library, restrictions on children's ability to speak to one another in the cafeteria during lunch, procedures for meetings regarding Individualized Education Programs, the treatment of children with disabilities, and special education funding.

At trial, Hartzell testified that the District reacted negatively to her advocacy.  For example, in 2011, a District employee said that Hartzell was "asking for the moon!!!"  Hartzell also identified an occasion in 2016 when Hartzell sent a strongly worded e-mail and, after sending the e-mail, was no longer welcome to volunteer at an elementary school where she had previously been permitted to do so.  Hartzell also identified an occasion two years later, in 2018, when a District employee told Hartzell that the District instructed the employee not to allow Hartzell to volunteer.  Around the same time, Hartzell also met with one of the District's assistant superintendents who told Hartzell she was not welcome at schools within the district other than those attended by her children.  Hartzell attributed these decisions to her advocacy.  Hartzell identified an instance in 2018 when a teacher said she was "pissed" after being criticized by Hartzell and said she had developed "nicknames" for Hartzell.  This teacher also called Hartzell her "first nasty parent."

In 2019, in the weeks before Dove Mountain opened as a new school in August of that year, and as Divijak transitioned from her position at a different school to become principal of Dove Mountain, Hartzell began directing her advocacy to Divijak.  In May 2019, Hartzell sent an e-mail to Divijak expressing concern that she and other parents had not received adequate notice of a meeting about elective courses.  Hartzell spoke to Divijak and offered to help at Dove Mountain.  Hartzell testified that Divijak responded abruptly that Dove Mountain was "not interested in help."  During the fall of 2019, Hartzell sent another e-mail to Divijak expressing her concern about second graders being instructed "they had to be quiet before they could go out to recess."  During that same semester, Hartzell also expressed

concerns to Divijak that Dove Mountain's library was too small.

On December 10, 2019, Hartzell e-mailed Divijak, expressing concerns about a school event where her children were scheduled to perform simultaneously in different locations. Hartzell was concerned that she would be unable to watch all her children perform, and she was also concerned about parking and childcare issues. At Divijak's invitation, Hartzell subsequently provided additional suggestions for the school.

## II. The February 7, 2020 Incident

On February 7, 2020, Dove Mountain hosted an event where students presented projects they had been working on for a few months. Two of Hartzell's children were scheduled to present in different rooms simultaneously. While attending the event, Hartzell saw Divijak in a classroom and approached her. Hartzell was accompanied by one of her children, who attended preschool at Dove Mountain. No other children were present. Hartzell "sarcastically" thanked Divijak for "making [her] choose which kid [she was] going to support again today." Hartzell testified that she began to walk away, but Divijak responded that she was "sorry that [Hartzell was] just never happy." Hartzell testified that she turned back around and explained her proposed solution to the scheduling conflicts. According to Hartzell, Divijak refused to speak with her further and began to walk away while Hartzell was speaking. Hartzell says she responded that it seemed she and Divijak were never able to have a conversation. However, Hartzell denies doing anything to stop Divijak from walking away and specifically denies grabbing Divijak's wrist. Even so, Hartzell acknowledges that she accidentally touched

Divijak's arm as she walked by and that she said "stop, I'm talking to you." Hartzell recalls that Divijak shouted, "Don't touch me." Hartzell testified that Divijak continued walking away and that Hartzell said, "Forget it. I'll just contact the District."

After her interaction with Divijak, Hartzell went to the room where one of her daughters was giving a presentation. Hartzell testified that she was approached by a hall monitor, who ordered Hartzell to leave immediately, informed her that the police would be called if she did not leave, and escorted her out of the building. Hartzell went to the parking lot and was approached by Marana Police Department Officer Jerry Ysaguirre.

According to Ysaguirre, Hartzell admitted placing her hand on top of Divijak's wrist to stop her so they could continue speaking. Hartzell said she immediately regretted this action and removed her hand. Hartzell insisted to Ysaguirre that she never grabbed Divijak's wrist.

Ysaguirre advised Hartzell about the procedures for investigating "an assault" involving a teacher. He told her that she was "trespassed from" the entire school property and that, while her children could continue to attend Dove Mountain, Hartzell could not enter school property and would have to arrange for someone else to drop off and pick up her children. Ysaguirre explained that Hartzell could be arrested for trespassing if she returned. Ysaguirre told Hartzell that the order would remain in effect until the District decided otherwise.

In an incident report, Ysaguirre wrote that "he was advised that the school want[ed Hartzell] trespassed from the property." In an e-mail, Greg Roehm, the District's Safety and Security Coordinator, stated that he met with Ysaguirre

who "indicated that Ms. Hartzell was given the trespass warning at [Divijak's] request" and that Ysaguirre said it "remains in effect until the district advises him to revoke the trespass alert."

Ysaguirre next spoke to Divijak. According to Ysaguirre, Divijak said she began to walk around Hartzell, who allegedly yelled out "Dam[n] it," said the conversation was not over, and demanded that Divijak stop walking away. Divijak said Hartzell reached out and grabbed Divijak's left wrist with her right hand, fully wrapping her hand around Divijak's wrist and holding on. Divijak told Ysaguirre that she had to pull her arm away to release Hartzell's grasp. Ysaguirre did not observe marks on Divijak's arms, and Divijak said she did not need medical attention.

Ysaguirre reviewed the school's security camera footage and determined that, although the actual grab was not seen on the video, Divijak's reaction to the contact was more consistent with her own description of the incident. That same day, Roehm reviewed the surveillance video and reported to the District Superintendent, Doug Wilson, and the Assistant Superintendents, Carolyn Dumler and Kristin Reidy, that the "wrist grab is not clear."

Ysaguirre also spoke to Paul Gute, a parent who was in the room during the encounter between Hartzell and Divijak. Although Gute could not see the actual physical contact, Gute testified that Hartzell reached out and touched Divijak. Gute also testified at trial that Hartzell touched Divijak but did not hit or grab her. Gute further testified that Hartzell did not hold Divijak, who pulled away quickly. Gute was not interviewed by the District.

## III.  After the Incident

Later that same day, Wilson, Dumler, Reidy, and Roehm discussed the incident in a group text.  In response to Wilson's request for the "back story," Reidy described Hartzell as "opinionated" and "not flexible at all."  Dumler described Hartzell as "[v]ery high maintenance."[3]  Principal Divijak's secretary, Sarah Wilson, called Hartzell "one of them" and indicated Hartzell had "been like this all year."  Wilson also described one of Hartzell's e-mails as "verbal diarrhea."

On February 24, 2020, Hartzell met with Superintendent Wilson and an attorney for the District.  Hartzell's husband and her attorney were also present.  Hartzell testified that the District said the decision to ban her from school grounds was final and would remain in place indefinitely.  Hartzell testified that the District would not lift the ban because the District "would have an upset assistant superintendent and principal."  Later in the conversation, the District agreed to permit Hartzell to enter school grounds to retrieve her preschooler, as long as she did not speak to anyone.  The District's attorney told Hartzell that she would receive a letter in the mail stating the conditions of her exclusion.  Hartzell did not receive any further communications from the District regarding the "trespass" order.  In June 2023, the District's counsel told Hartzell that the order was lifted.

On March 30, 2020, the state filed misdemeanor assault charges against Hartzell in Marana Municipal Court for

---

[3] At trial, Dumler testified that high maintenance is "a term to describe parents who are very involved and take some time, but they want the best for their kids."  When asked if these parents "ruffle feathers within the district," she said "you could say that, but at the same time they are parents that add a lot, so we work with them."

"knowingly touching another person with the intent to injury, insult of provoke such person," in violation of Ariz. Rev. Stat. § 13-1203(A)(3). At the request of the town prosecutor, the charges were dismissed on September 22, 2020.

## IV.  District Policy KFA

Hartzell contends that the District's exclusion order was issued pursuant to a District policy. Specifically, Hartzell relies on the policy regarding public conduct on school property, District Policy KFA, which prohibits "[a]ny conduct intended to obstruct, disrupt, or interfere with" a school's operations, "[p]hysical or verbal abuse or threat of harm to any person on property owned or controlled by the District," and "[u]se of speech or language that is offensive or inappropriate to the limited forum of the public school educational environment." The policy provides that "[a]ny member of the general public considered by the Superintendent, or a person authorized by the Superintendent, to be in violation of these rules shall be instructed to leave the property of the District," and that "[f]ailure to obey the instruction may subject the person to criminal proceedings pursuant to A.R.S. 13-2911 [for trespassing.]"[4]

---

[4] The cited statute provides that "[t]he chief administrative officer of an educational institution or an officer or employee designated by the chief administrative officer to maintain order may order a person to leave the property of the educational institution if the officer or employee has reasonable grounds to believe either that: 1. Any person or persons are committing any act that interferes with or disrupts the lawful use of the property by others at the educational institution [or] 2. Any person has entered on the property of an educational institution for the purpose of

At trial, Assistant Superintendent Dumler was asked if the District's policies allowed a person to be banned from schools based on their speech. Dumler responded as follows:

> Q. In fact, does one of the [D]istrict's own policies allow someone to be banned due to speech?
> A. Yes, it does. Well, not due to speech. Well, due to offensive or belligerent or disorderly conduct. There's a couple of different phrases in the policy.
> Q. The kind of offensive speech that's in the ear of the hearer, like you said earlier, right?
> A. I would – I would say that before the district would ban someone, we would probably consult our legal counsel. That would be our typical practice. We have banned someone because of aggressive, belligerent, obnoxious cursing and swearing at referees and coaches and things like that. So it can be – there are times when it can be done.
> Q. And that case you're talking about, about a parent being temporarily trespassed from a sporting event for being belligerent and swearing and cursing and going on and on, is

committing any act that interferes with or disrupts the lawful use of the property by others at the educational institution." Ariz. Rev. Stat. Ann. § 13-2911(C). It also punishes "[i]ntentionally or knowingly refusing to obey a lawful order given pursuant to subsection C of this section." *Id.* § 13-2911(A)(3).

that anything like what Professor Hartzell was doing?

A. Well, it's different. And part of what makes it different is that law enforcement was involved in this one. So because there was an ongoing law enforcement investigation, we probably did not do all of the things in the same order or the same way that we normally would. Typically, it just is a principal who brings a situation to us, and then we consult legal counsel.

## V. The Allegedly Defamatory Documents

In October 2020, Hartzell's supervisor at the University of Arizona advised her that a document "regarding [Hartzell] was delivered to her department." This document was a printout of the docket from the criminal case brought against Hartzell. In the upper right-hand corner of the copy of the docket sheet, there was a typed note reading: "This occurred at a K-8 school in front of young children. Doesn't seem like this is the kind of person that should be training teachers let alone working with kids."

In April 2021, someone also sent an unsigned note to the Compliance Office at Hartzell's employer. The note read as follows:

Please be advised that your professor, Rebecca I. Hartzell has, for at least the last two (2) years, been using her **University of Arizona** email account to harass, bully, intimidate and threaten people.

A full audit of her account will verify these accusations.

Additionally, I have great concern about her mental health.

I send this without signature for fear of retribution but hope you will take this matter seriously.

The district court assumed without deciding there was sufficient circumstantial evidence Divijak sent both documents. Divijak does not challenge that assumption on appeal and instead argues that the district court correctly concluded that the statements were not defamatory.

## VI. Procedural History

On February 4, 2021, Hartzell sued the District and Divijak. [5] As relevant here, Hartzell brought a First Amendment retaliation claim against both the District and Divijak, a procedural due process claim against the District, and a defamation claim against Divijak. After the close of discovery, the district court granted partial summary judgment against Hartzell. Three parts of that decision are relevant. First, the district court granted summary judgment on the procedural due process claim against the District because Hartzell did not have a constitutionally protected liberty interest in accessing school property. The district court considered only Hartzell's Fourteenth Amendment right to direct the education of her children in determining whether Hartzell had a protected liberty interest because the relevant portion of Hartzell's First Amended Complaint cited only that right. Second, the district court concluded that Divijak was entitled to qualified immunity on the First

---

[5] Hartzell also sued Divijak's husband, Joseph Divijak, solely "for collection and judgment enforcement purposes" against their marital community.

Amendment retaliation claim because Divijak did not have adequate notice that her conduct violated a clearly established right. Third, the district court granted partial summary judgment in favor of Divijak on the defamation claim, concluding that the statements in the two documents sent to Hartzell's employer were substantially true or unactionable. The district court allowed the defamation claim to proceed based on certain oral statements made by Divijak.

After losing her procedural due process claim, Hartzell sought to amend her pleadings to state that this claim also arose out of the First Amendment. The district court denied Hartzell's request for leave to amend.

At trial, the district court precluded questioning or argument regarding Hartzell's theory that the District was liable for the violation of her First Amendment rights under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), using a "final policymaker" theory. The district court reasoned that, even if this theory had been adequately pled, it was not contained in the joint proposed pretrial order. That order only identified "[w]hether the District has a custom, policy, or practice which was the moving force behind the alleged First Amendment retaliation" as a contested issue of fact and law.

At the close of Hartzell's case in chief, the Appellees moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The district court granted the motion on Hartzell's First Amendment retaliation claim against the District. As a result, only Hartzell's defamation claim against Divijak was submitted to the jury. The jury found in Divijak's favor.

Hartzell now appeals (i) the grant of the District's motion for judgment as a matter of law with respect to the First Amendment claim against the District; (ii) the exclusion of her "final policymaker" theory; (iii) the grant of Divijak's motion for summary judgment with respect to the First Amendment claim against Divijak; (iv) the grant of summary judgment with respect to her due-process claim (and the related denial of her motion for leave to amend); and (v) the exclusion of certain of her defamation theories at the summary-judgment stage.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

"We review a district court's grant of summary judgment de novo." *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 (9th Cir. 1999). We "[v]iew[] the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor[.]" *Id.* Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Similarly, "[w]e review de novo an order granting or denying judgment as a matter of law" pursuant to Fed. R. Civ. P. 50(a). *Quicksilver, Inc v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006) (quoting *Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998)). "Judgment as a matter of law is proper when the evidence permits a reasonable jury to reach only one conclusion." *Id.* (quoting same). As in the summary-judgment context, "we must consider all the evidence and all reasonable inferences drawn from the evidence in a light most favorable to" the non-moving party. *Id.* (quoting *Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977)).

"The district court's alleged evidentiary errors are reviewed for abuse of discretion." *Geurin v. Winston Indus., Inc.*, 316 F.3d 879, 882 (9th Cir. 2002).

"The district court's denial of leave to amend the complaint is reviewed for an abuse of discretion." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).

## ANALYSIS

## I. First Amendment Retaliation Claim Against the District

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). "In particular, . . . a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

We have identified "three ways" in which "[a] plaintiff can satisfy *Monell*'s policy requirement." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). "First, a local government may be held liable when it acts 'pursuant to an expressly adopted official policy.'" *Id.* (quoting *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (per curiam)). "Second, a public entity may be held liable for a 'longstanding practice or custom.'" *Id.* (quoting same). "Third, 'a local government may be held liable under [Section] 1983 when "the individual who committed the constitutional tort was an official with final policy-making authority" or such an official "ratified a subordinate's

unconstitutional decision or action and the basis for it.""" *Id.* (alteration in original) (quoting *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)).

### A. The "Final Policymaker" Theory

The district court did not abuse its discretion in excluding Hartzell's attempt to prove her *Monell* claim using the "final policymaker" theory.

The district court excluded this theory because Hartzell failed adequately to identify it in the joint pretrial statement.[6] "[P]arties have a duty to advance any and all theories in the pretrial order[] . . . ." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1077 (9th Cir. 2005). "Accordingly, a party may not 'offer evidence or advance theories at the trial which are not included in the order or which contradict its terms.'" *Id.* (quoting *United States v. First Nat'l Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981)). "A pretrial order, however, should be liberally construed to permit any issues at trial that are 'embraced within its language.'" *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 368 (9th Cir. 1985) (quoting *Circle*, 652 F.2d at 886). Even so, "particular evidence or theories which are not at least implicitly included in the order are barred." *Circle*, 652 F.2d at 886.

The "final policymaker" theory is a separate legal theory; the district court did not abuse its discretion by precluding that theory at trial. We have repeatedly identified the methods for proving *Monell* liability as separate legal theories. *See, e.g.*, *Bell v. Williams*, 108 F.4th 809, 818 (9th

---

[6] It is therefore unnecessary for us to address whether Hartzell also needed to move to amend her pleadings to present this theory.

Cir. 2024) (referring to the plaintiff's three "*Monell* theories of liability"); *Benavidez v. County of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021) (rejecting "[e]ach of the [plaintiffs'] three *Monell* theories"). We have treated the "final policymaker" theory as a separate theory from the "policy, practice, or custom" theory. *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1172 (9th Cir. 2021) (noting "the constitutional violation must be caused by a 'policy, practice, or custom,' or be ordered by a policy-making official").

In addition, the "final policymaker" theory requires proof that differs significantly from the other two *Monell* theories. *See Lytle v. Carl*, 382 F.3d 978, 982–83 (9th Cir. 2004) (discussing how this court determines whether an employee is a "final policymaker"). Among other things, the "final policymaker" focuses on a specific person or persons, their authority, their knowledge, and what they said and did on a specific occasion to ratify a specific decision. *See, e.g.*, *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (reviewing the actions and state of mind of the policymakers). The other *Monell* theories focus on the municipality's policies, customs, or practices for a class of situations. *See, e.g.*, *Castro*, 833 F.3d at 1075–76 (reviewing what precautions the entity defendants had taken for all prisoners detained in the police station's "sobering cell").

Once a "final policymaker" theory is added, the final policymaker becomes a new central character whose presence significantly affects the scope of the claim. When a plaintiff fails to disclose that the assertion of *Monell* liability is based on a "final policymaker" theory of liability, "the objectives of the pretrial conference to simplify issues and avoid unnecessary proof by obtaining admissions of fact

will be jeopardized if not entirely nullified." *Circle*, 652 F.2d at 886.

The district court did not abuse its discretion in finding Hartzell had not adequately disclosed a "final policymaker" theory. In the joint proposed pretrial order that was later adopted as the final pretrial order, Hartzell identified "[w]hether the District has a custom, policy, or practice which was the moving force behind the alleged First Amendment retaliation" as a contested issue of fact in the proposed pretrial order. Hartzell did not, however, identify as a contested issue whether a district employee, such as Superintendent Wilson, was a final policymaker or whether a final policymaker had ratified Divijak's decision or action. The district court reasonably understood the phrase "custom, policy, or practice" to invoke the first and second theories enumerated in *Gordon*, those based on an expressly adopted official policy or a longstanding practice or custom.

As Hartzell argues, the word "policy," and other phrases containing that word, are sometimes used to encompass all the methods for proving *Monell* liability. *See, e.g.*, *Bidwell v. County of San Diego*, No. 22-55680, 2023 WL 7381462, at \*2 (9th Cir. Nov. 8, 2023) ("A policy may consist of an expressly adopted municipal policy, a longstanding practice or custom, or an action taken or ratified by an official with final policymaking authority"). While Hartzell is correct, the authority upon which she relies clarifies that there are three ways in which a plaintiff can satisfy the "policy" element and, again, treats "final policy-making authority" as a separate theory. *Gordon v. County of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021); *see Scanlon v. County of Los Angeles*, 92 F.4th 781, 811–12 (9th Cir. 2024) (identifying "three ways a plaintiff can satisfy *Monell*'s policy requirement").

Hartzell further argues that the word "policy" is contained in the phrase "final policymaker," but this is not persuasive. The use of the word "policy" does not implicitly include all the legal theories that also include the word "policy." In the pretrial order, Hartzell described the contested issue as "whether the District *has a* custom, policy, or practice which was the moving force behind the alleged First Amendment retaliation." The placement of "has a" before "custom, policy, or practice," supports the district court's conclusion that Hartzell was proceeding under the first two theories of *Monell* liability, as opposed to asserting that a specific person was a "final policymaker." Moreover, Hartzell used "policy" as an alternative to "custom" and "practice," which suggests that she was using "policy" in its narrower sense rather than to refer to the "final policymaker" theory of proving *Monell* liability. Based on these circumstances, and given the district court's familiarity with the parties' positions and the case's history, the district court's understanding of Hartzell's position does not reflect an abuse of discretion.

Hartzell objects that the District and Divijak were permitted to pursue legal theories relating to the timeliness of Hartzell's claims that were not disclosed in the joint pretrial proposed order. Hartzell has not appealed these decisions. Even if she had, the district court did not abuse its discretion in permitting these arguments. These theories were discussed extensively in the district court's summary judgment order, so any risk of prejudice and surprise was limited.

In her reply brief, Hartzell argues for the first time that she timely disclosed a "final policymaker" theory in her trial brief. This argument fails for two reasons. First, Hartzell forfeited it by failing to raise it in her opening brief. *See*

*Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief."). Second, Hartzell's later disclosures did not cure her breach of the "duty to advance any and all theories in the pretrial order[.]" *El-Hakem*, 415 F.3d at 1077.

## B. The "Policy" Theory and District Policy KFA

Notwithstanding the district court's reasonable decision to exclude evidence of the "final policymaker" theory, we conclude that its overall resolution of the First Amendment retaliation claim against the District was erroneous. Specifically, the district court erred in granting the District's Rule 50(a) motion with respect to the First Amendment claim because a reasonable jury could have concluded that Hartzell was unconstitutionally banned based on official District policy. The provision of Policy KFA banning "speech . . . that is offensive or inappropriate" would be unconstitutional if applied to ban Hartzell for criticizing Divijak. And Hartzell presented sufficient evidence for a reasonable jury to conclude that the District relied on this policy, rather than Hartzell's alleged assault on Divijak, to ban Hartzell from the Dove Mountain school premises.

### 1. Constitutionality of Policy KFA

The District contends that Policy KFA is constitutional because it prohibits only "interference with or disruption of an educational institution." On its own, there would be little doubt that this prohibition is constitutional. However, this sentence does not stand alone; instead, Policy KFA provides an expansive definition of "interference with" and "disruption of" that forms the basis of Hartzell's constitutional challenge. Policy KFA defines "interfer[ing] with or disrupt[ing]" an educational institution to include,

among other things, "[u]se of speech or language that is offensive or inappropriate to the limited forum of the public school educational environment."  "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). Because Policy KFA allows the District to prohibit speech that it finds "offensive or inappropriate," it runs afoul of this principle.  *See id.*

The District defends Policy KFA by arguing that schools nevertheless have substantial authority to regulate speech on school grounds.  It is certainly true that "courts must apply the First Amendment 'in light of the special characteristics of the school environment.'"  *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187 (2021) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)).  Even so, for "school officials to justify prohibition of a particular expression of opinion, [they] must be able to show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969).  "Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained."  *Id.* (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)); *accord id.* at 513 (using the equivalent phrase "materially disrupts classwork or involves substantial disorder or invasion of the rights of others").

Here, the District has failed to make this showing.  First, Hartzell proffered testimony that she did not grab Divijak's arm, but merely accidentally touched Divijak's arm as she walked by.   A reasonable jury could infer from this testimony that Hartzell was banned for her speech during her encounter with Divijak as opposed to any physical contact. "'[P]ure speech' . . . is entitled to comprehensive protection under the First Amendment." *Tinker*, 393 U.S. at 505–06.

Second, the District's interest in disciplining and protecting students was not in play.  The speaker was a parent rather than a student, the parent was speaking to another adult, and the only child within earshot was the speaker's own.  On these facts, the District does not have a special interest in regulating speech because it is not standing "in the place of parents," as sometimes occurs when regulating student speech. *Mahanoy*, 594 U.S. at 187.

Third, to be sure, schools have "an interest in protecting minors from exposure to vulgar and offensive spoken language." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986).  But although Hartzell's speech was critical and sarcastic, it was not vulgar or lewd like the speech described in *Bethel*.  *See id.* at 678 (use "of an elaborate, graphic, and explicit sexual metaphor" during school assembly).  *Bethel* also recognized a school's interest in "prohibit[ing] the use of vulgar and offensive terms in public discourse."  *See id.* at 683.  However, unlike a "school assembly or a classroom" with an "unsuspecting audience of . . . students," *id.* at 685, the need to teach students the "appropriate form of civil discourse" does not arise when the speech at issue is made by a parent to an administrator outside of the presence of students except for the parent's child.  *Id*. at 683, 685.

The Supreme Court has identified a few other categories of speech that schools have a special interest in regulating, but Hartzell's speech fits none of them. *See Mahanoy*, 594 U.S. at 187–88 (identifying properly regulated categories of speech, including speech promoting illegal conduct and speech others may reasonably perceive as being endorsed by the school).

Finally, although Hartzell's speech occurred on school property, Hartzell had been invited to attend the presentations of her children, and Divijak had been speaking with other parents. In that context, it was not disruptive or intrusive for Hartzell to approach Divijak and express concerns related to her children's education.

The District cannot constitutionally prohibit all speech on school property that it finds "offensive or inappropriate." Nor can the District prohibit that speech simply by defining it as disruptive or intrusive. Clearly, the District can prohibit offensive or inappropriate speech if it "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school[.]" *Tinker*, 393 U.S. at 509 (quoting *Burnside*, 363 F.2d at 749). Although "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" could be different. *Id.* at 508, 514. Such facts are not present here.

As a result, the provision of Policy KFA barring "speech . . . that is offensive or inappropriate" is unconstitutional if the District applied it to ban Hartzell because of her criticism of Divijak.

## 2. Whether Hartzell was Banned Pursuant to Policy KFA

At trial, the parties presented conflicting testimony and theories to establish the reason Hartzell was banned from Dove Mountain. Based on this conflicting evidence, a reasonable jury could credit the evidence that Hartzell was banned because she intentionally touched or grabbed Divijak. A jury could also credit the testimony that the District did not rely on Policy KFA in banning Hartzell and that Divijak did not have authority under Policy KFA to ban Hartzell from Dove Mountain. But this disputed testimony presents a factual question, and "[a] question of fact may be resolved as a matter of law" only if "reasonable minds cannot differ and the evidence permits only one conclusion." *Quicksilver*, 466 F.3d at 759.

Hartzell presented evidence from which a reasonable jury could infer that (1) Policy KFA allowed the District to ban those whose speech the District deemed offensive or inappropriate, (2) Divijak found Hartzell's advocacy offensive, and (3) she was banned after criticizing Divijak. Thus, as we explain next, Hartzell presented sufficient evidence from which the jury could have concluded that the District banned her for offensive or inappropriate speech pursuant to an official policy in violation of the First Amendment.

We first consider whether Hartzell presented sufficient evidence from which the jury could infer that District policy allowed Divijak or other District employees to ban parents from school premises for offensive speech. The most significant evidence on this point is Policy KFA, which expressly prohibits "speech or language that is offensive or inappropriate to the limited forum of the public school

educational environment." Addressing this policy, Assistant Superintendent Dumler testified, albeit equivocally, that parents could be banned from school premises because of offensive or inappropriate speech. When asked whether the District had a policy of "allow[ing] for someone to be banned due to speech," she responded, "[y]es," but then immediately stated "not due to speech," but "due to offensive or belligerent or disorderly conduct. There's a couple of different phrases in the policy." She then provided one example of the District banning someone "because of aggressive, belligerent, obnoxious cursing and swearing at referees and coaches" at a sporting event. She testified that in her 20 years working in the District's administration, this was the only incident in which a parent was trespassed from any district property.[7] However, the evidence must be viewed in the light most favorable to Hartzell, and a reasonable jury could find that Policy KFA authorized the ban Divijak imposed here.

Next, a jury could infer that Divijak found Hartzell's criticisms offensive from the facts of the February 7, 2020 incident. Hartzell sarcastically thanked Divijak for "making [her] choose which kid [she was] going to support again today[,]" and a reasonable jury could find that Divijak would be offended by this statement. Divijak's reaction to Hartzell's speech would also support a jury finding that she was offended. For example, Divijak walked away from Hartzell while Hartzell was still speaking, and Divijak

---

[7] Although Dumler did not refer to the policy that she was discussing as the Policy KFA, her description of that policy as including "a couple of different phrases" and as including the word "offensive" tracks with the language of the Policy KFA. Therefore, a reasonable jury could infer that Dumler's testimony referred to Policy KFA.

shouted at Hartzell after Hartzell touched her arm.[8]  And after the incident, Divijak was "crying," she requested that Ysaguirre give Hartzell a trespass warning, and she told him that she wanted to press charges against Hartzell.

Finally, Hartzell was banned a short time after the encounter with Divijak.  Because a reasonable jury could find that Policy KFA authorized Divijak to ban parents whose speech she found offensive and that Hartzell was banned almost immediately after saying things Divijak could reasonably find offensive, a reasonable jury could also find that Policy KFA was a moving force behind the ban on Hartzell.

Our opinion in *Eagle Point Education Ass'n/SOBC/OEA v. Jackson County School District No. 9*, 880 F.3d 1097 (9th Cir. 2018), further supports Hartzell's theory of the District's *Monell* liability based on an official policy.  In that case, a school district adopted policies in anticipation of a teacher's strike that prohibited, among other things, signs and banners at any district facilities without the approval of the district superintendent. *Id.* at 1100.  A student filed suit against the district, alleging violations of the First Amendment, after a district security guard prohibited her from parking her car in a school lot with a sign in the back windshield stating that she supported the teachers. *Id*. at 1101.  The school district argued "that [a] restriction imposed on [a student's speech] was not an application of the District['s] policies." *Id.* at 1107.  "Specifically, it contend[ed] that [the student] was a victim of [a] security guard's own decision, not [the challenged policy]." *Id.*  We rejected that argument because

---

[8] Of course, Divijak's position is that Hartzell grabbed her wrist. However, Hartzell denies this, and the evidence at this stage of the litigation must be viewed in the light most favorable to Hartzell.

the security guard's action "was by no means an implausible interpretation" of the relevant policy.  "Moreover, at the time of the incident, the high school's assistant principal did not tell [the student] that the guard had made a mistake."  *Id.* at 1107–08.  Instead, the assistant principal said the student's conduct was "forbidden."  *Id.* at 1108.[9]  We found there was "no suggestion that the security officer would have taken any action but for the adoption and enforcement of the policies," and we affirmed a grant of summary judgment in the plaintiff's favor.  *Id.* at 1107.

Here, Hartzell contends she was banned pursuant to a District policy prohibiting "offensive speech," while the District denies that Hartzell was banned based on her speech and instead contends that Hartzell was banned for her conduct, alleging that she assaulted Divijak.  As explained above, a reasonable jury could conclude that Policy KFA allows members of the public to be banned from schools for offensive or inappropriate speech, Hartzell's speech could be viewed as offensive or inappropriate, and Hartzell was banned.  Moreover, a reasonable jury could conclude that Divijak relied on Policy KFA to ban Hartzell, and Divijak's conduct in banning Hartzell would not have been an "implausible interpretation" of the policy.  *See id*. at 1107–08.  And like the assistant principal in *Eagle Point*, here the superintendent did not revoke the ban as a mistake or suggest that Divijak lacked authority to ban Hartzell.  Instead, the superintendent stated that the ban "would remain indefinitely and that the decision was final."

---

[9] The record in *Eagle Point* did not indicate that the assistant principal or the security guard invoked the policy challenged by the plaintiff.  *See id.* at 1101.

The District's arguments that the district court properly granted its Rule 50 motion are not persuasive: they are based on disputed facts, and from these facts a reasonable jury could find that Hartzell was banned pursuant to official District policy.  First, although Dumler testified that Divijak had no authority to ban anyone under Policy KFA, a jury could reject this testimony.  Moreover, the course of events in this case could support a finding that Divijak had the authority to ban Hartzell.  Specifically, there was evidence that Divijak requested the trespass order, and as previously discussed, the District Superintendent did not revoke the ban but instead confirmed that it would remain in effect.

Second, the District argues that Hartzell denied violating the policy and thus could not have been ejected pursuant to it.  This argument fails because the District could have banned Hartzell pursuant to Policy KFA for "offensive speech," even though Hartzell denied that she violated the policy.  Indeed, Hartzell testified that she believed that she did not violate Policy KFA but was excluded because the District decided she had violated it.

Third, the District argues that various witnesses testified that it did not rely on Policy KFA to ban Hartzell.  A jury could credit this testimony and reject Hartzell's claims, but because all reasonable inferences must presently be drawn in Hartzell's favor, this argument does not entitle the District to judgment as a matter of law.  There is sufficient evidence in the record to permit a reasonable jury to find that Hartzell was banned pursuant to Policy KFA.

Accordingly, the district court erred in granting judgment as a matter of law to the District on Hartzell's First Amendment claim because a reasonable jury could conclude that Hartzell was banned pursuant to the District's

"expressly adopted official policy."  *Gordon*, 6 F.4th at 973 (quoting *Monell*, 436 U.S. at 694).

## C.  The "Custom and Practice" Theory

Turning to Hartzell's "custom and practice" theory of *Monell* liability, she argues that, even if the evidence she presented at trial was not sufficient, that was because she relied on the district court's statement that she had already established liability under this theory.

At trial, the District objected to the relevance of questions by Hartzell's counsel about whether there was a practice of retaliation for speech in the District.  Hartzell's counsel explained that the purpose of his questioning was "to show that there's a custom within the district of similar retaliatory conduct."   The district court responded that Hartzell had "established that" but the current question sought "basically an admission by the [testifying witness] that there is a custom or practice."

Although the district court's response lacked precision, read in context, it is clear that the district court was acknowledging that Hartzell had established *why* a custom of retaliatory conduct would be relevant, not that Hartzell had established that this custom *existed*.   Indeed, the following day, Hartzell's counsel argued that the district court had ruled that he had established a custom of retaliation and so counsel concluded that he did not need "to keep pushing this anymore."   The district court clearly rejected counsel's characterization of its ruling sustaining the relevance objection, stating "You misunderstand my comments, Counsel.  I didn't say you'd established custom, policy or practice.  That's what the whole case is about, basically.  If I had done that, I guess I could have done a directed verdict in your favor."

Moreover, even if the district court had expressed the latter belief, nothing barred the district court from reconsidering its conclusion.  "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 889 (9th Cir. 2001) (quoting *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. Oct. Unit A 1981)).  Accordingly, the district court was not bound by any mid-trial determination about the sufficiency of Hartzell's evidence.

In her reply brief, Hartzell also argues that she offered sufficient evidence of a custom of retaliation because there were several instances when Hartzell or others had been banned for their protected speech.  However, Hartzell's opening brief argues that the Rule 50(a) motion was improperly granted as to the custom theory only because of the district court's statements.  Hartzell thus forfeited this argument.  *Miller v. City of Scottsdale*, 88 F.4th 800, 805 n.4 (9th Cir. 2023).

## II.     First Amendment Claim Against Divijak

The district court did not err in concluding that Divijak was entitled to qualified immunity on Hartzell's First Amendment retaliation claim.

"Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To determine whether [a government actor] is entitled to qualified immunity, a court must evaluate

two independent questions: (1) whether the [government actor's] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Id.* As already noted, a reasonable jury could determine that Divijak banned Hartzell in violation of a constitutional right. The question is whether that right was clearly established.

A right is clearly established "when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Although the Supreme Court 'does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Evans v. Skolnik*, 997 F.3d 1060, 1066 (9th Cir. 2021) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). The question is beyond debate when "there are 'cases of controlling authority' in the plaintiff['s] jurisdiction at the time of the incident 'which clearly established the rule on which [she] seek[s] to rely,' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

"The Supreme Court has 'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *Id.* at 1067 (quoting *al-Kidd*, 563 U.S. at 742). In the First Amendment context, "the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from" a particular type of government action. *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (focusing on

the "right to be free from a retaliatory arrest that is otherwise supported by probable cause").

Hartzell's reliance on *O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016), is misplaced. Although we noted in *O'Brien* that "[t]he constitutional right to be free from retaliation [i]s 'clearly established[,]'" *O'Brien* arose at the pleading stage before "an evidentiary record ha[d] been developed through discovery[.]" 818 F.3d at 936 (quoting *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 970 (9th Cir. 2010)). Therefore, in *O'Brien* we decided only the narrow point that we could not "determine, based on the complaint itself, that qualified immunity applies." *Id.* (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)). Thus, *O'Brien*'s holding does not suggest that, especially at summary judgment, the appropriate level of analysis is the general right to be free from retaliation.[10]

Here, qualified immunity applies. "[C]ourts must apply the First Amendment 'in light of the special characteristics of the school environment.'" *Mahanoy*, 594 U.S. at 187 (quoting *Hazelwood*, 484 U.S. at 266). As a result, cases arising outside public schools are of limited use in evaluating the scope of Hartzell's First Amendment rights here. Hartzell has identified one case arising in public schools, *Macias v. Filippini*, Case No. 1:17-CV-1251 AWI EPG, 2018 WL 2264243 (E.D. Cal. May 17, 2018). Even accepting that *Macias* is analogous, one district court case is

---

[10] *Krainski* does not support Hartzell either. *Krainski* merely held that "the doctrine of qualified immunity protects state actors when the constitutional right at issue was not 'clearly established' at the time of the actions at issue." 616 F.3d at 970 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 227, 235 (2009)).

neither a case of controlling authority nor a consensus of cases of persuasive authority. *See Evans*, 997 F.3d at 1067.[11]

In her reply brief, Hartzell argues that an Arizona statute regarding misrepresentations to the police establishes that Divijak's conduct violated her clearly established rights and that qualified immunity is inconsistent with the Civil Rights Act of 1871. We do not consider these arguments because Hartzell forfeited them by presenting them for the first time in her reply brief. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259-60 (9th Cir. 1996).

Hartzell also argues for the first time in her reply brief that "in a sufficiently 'obvious' case of constitutional misconduct, we do not require a precise factual analogue in our judicial precedents." *See Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). Hartzell waived this argument twice, first by failing to raise it in her opposition to Appellees' motion for summary judgment and again by failing to raise it in her opening brief here. *See United States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994) ("Issues not presented to the district court cannot generally be raised for the first time on appeal.").

For these reasons, the district court's qualified-immunity determination was not erroneous.

## III.    Procedural Due Process

"The Fourteenth Amendment protects individuals against the deprivation of liberty or property by the

---

[11] Hartzell does not identify any cases supporting her view that her clearly established rights were violated other than (1) those establishing a general right to be free from retaliation and (2) *Macias v. Filippini*, Case No. 1:17-CV-1251 AWI EPG, 2018 WL 2264243 (E.D. Cal. May 17, 2018), discussed *infra*.

government without due process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). "A section 1983 claim based upon procedural due process thus has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Id.* Here, the district court concluded that Hartzell "had no constitutional right to access school property, [so] no procedural due process was required before [she] was banned from the property."

The only right Hartzell identified in her First Amended Complaint was the "fundamental right to direct the education of her children." Indeed, "the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (first citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), and then quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)). This is often called the *Meyer-Pierce* right. However, "once parents make the choice as to which school their children will attend, their fundamental right to control the education of their children is, at the least, substantially diminished." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005), *opinion amended on denial of reh'g sub nom. Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187 (9th Cir. 2006).

Here, Hartzell was banned from accessing school property. This does not implicate Hartzell's right to direct her children's education. Instead, "what *Meyer-Pierce* establishes is the right of parents to be free from state interference with their choice of the educational forum itself, a choice that ordinarily determines the type of education one's child will receive." *Id.* at 1207. Because Hartzell does not allege that her ability to send her children to the school

of her choice was restricted, the *Meyer-Pierce* right does not apply. Hartzell seeks to distinguish *Fields* on the grounds that her ban extended beyond the schoolhouse itself to the school's parking lot and other facilities. *See Fields*, 427 F.3d at 1207 (suggesting, in now-superseded language, that "the *Meyer-Pierce* right does not extend beyond the threshold of the school door"). Setting aside that the language Hartzell relies on was superseded, Hartzell takes an overly formalistic view of *Fields*. The quoted language merely reiterates that the *Meyer-Pierce* right allows Hartzell to choose what type of school her children attend.

In the alternative, Hartzell argues that her due process claim encompassed a First Amendment theory. However, the district court found that she did not allege a procedural due process claim in her First Amended Complaint. "[A]dding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under [the new] theory of liability." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). Accordingly, "[a]fter having focused on [one theory] in their complaint and during discovery, [plaintiffs] cannot turn around and surprise the [defendant] at the summary judgment stage" with a completely different theory. *Id.* at 1292–93. The plaintiff's claim cannot survive when "the complaint gave the [defendant] no notice of the specific factual allegations presented for the first time in [the] opposition to summary judgment." *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006).

The district court did not err in finding that Hartzell's First Amended Complaint did not adequately disclose this theory. There, after a more thorough discussion of the right to direct the education of her children, Hartzell alleged only that "[t]he Due Process Clause of the Fourteenth

Amendment prohibits the government from censoring speech pursuant to vague standards that grant unbridled discretion." Although this allegation uses the phrase "censoring speech," it does not mention either the First Amendment or retaliation. Also, while this allegation states a legal principle, it does not identify which liberty or property interest Hartzell was allegedly deprived of or what the District did to deprive her of it. "[T]he necessary factual averments are required with respect to each material element of the underlying legal theory . . . ." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (alteration in original) (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)). Summary judgment is not "a procedural second chance to flesh out inadequate pleadings." *Id.* (quoting same). Finally, although the First Amended Complaint invoked the First Amendment in a separate § 1983 claim alleging retaliation, First Amendment retaliation and procedural process claims involve different burdens and defenses. Therefore, the District would have been prejudiced if Hartzell were permitted to proceed on a First Amendment theory that she had not pled in the operative complaint.

The district court also did not abuse its discretion in denying Hartzell's motion to amend the First Amended Complaint to add a First Amendment theory to her procedural due process claim. The district court entered a scheduling order with a deadline to amend the pleadings. Hartzell filed her motion after that deadline. Accordingly, Hartzell needed to satisfy Rule 16(b)'s "good cause" standard to be permitted to amend. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608–09 (9th Cir. 1992). That standard "primarily considers the diligence of the party seeking the amendment," and "[i]f that party was not

diligent, the inquiry should end." *Id.* at 609. Here, Hartzell waited more than two months after the district court's summary judgment ruling before moving to amend the First Amended Complaint. The district court did not abuse its discretion in finding that Hartzell was not diligent.

Even if Hartzell had satisfied Rule 16's "good cause" standard, the district court would not have abused its discretion in concluding that prejudice to the District would provide an independent basis for denying leave to amend. *See Coleman*, 232 F.3d at 1295 (noting that "prejudice to [the defendant], although not required under Rule 16(b), supplies an additional reason for denying" leave to amend). As the district court noted, granting leave to amend would have prejudiced the District by negating its summary judgment victory and potentially requiring another round of summary judgment briefing.

## IV.   Defamation

The district court erred in granting summary judgment in Divijak's favor on part of Hartzell's defamation claim. In presenting her defamation claim, Hartzell sought to rely on two documents allegedly sent to her employer.[12] A jury could find one of those documents defamatory, but the district court correctly granted summary judgment with respect to the other document. "To support a claim for defamation, a statement about a private figure on a matter of private concern 'must be false' and must bring the subject of

---

[12] In a footnote, the Appellees suggest that Hartzell may have failed to preserve this ground of appeal by not seeking to admit the two documents at trial. Because the district court ruled at summary judgment that Hartzell could not present a defamation claim using these documents, she was not required to seek their admission at trial to present this argument on appeal.

the statement 'into disrepute, contempt, or ridicule' or impeach the subject's 'honesty, integrity, virtue, or reputation.'" *Takieh v. O'Meara*, 497 P.3d 1000, 1006 (Ariz. Ct. App. 2021) (quoting *Turner v. Devlin*, 848 P.2d 286, 288–89 (Ariz. 1993) (in banc)).

This principle establishes two limits on defamation claims. First, "[w]hile any disparaging statement can cause reputational harm, a true statement cannot support a claim for defamation." *Id.* (citing *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 941 (Ariz. 1991) (in banc)).

Second, "a statement is not actionable if it is comprised of 'loose, figurative, or hyperbolic language' that cannot reasonably be interpreted as stating or implying facts 'susceptible of being proved true or false.'" *Id.* (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)). "The key inquiry is whether the challenged expression, however labeled by the defendant, would reasonably appear to state or imply assertions of objective fact," which depends on "the impression created by the words used as well as the general tenor of the expression, from the point of view of a reasonable person at the time the statement was uttered and under the circumstances it was made." *Id.* (internal quotation marks omitted) (quoting *Yetman v. English*, 811 P.2d 323, 328 (Ariz. 1991) (in banc); then quoting *Sign Here Petitions LLC v. Chavez*, 402 P.3d 457, 463 (Ariz. Ct. App. 2017)). "[S]tatements cast as subjective beliefs are generally insulated from defamation liability[] . . . ." *Id.* However, statements of opinion are actionable "when they imply a false assertion of fact" or when they "may be proven false[.]" *Id.* (quoting *Turner*, 848 P.2d at 293). They are not actionable when they do not "present 'the kind of empirical question a fact-finder can resolve.'" *Id.* (quoting *Yetman*, 811 P.2d at 333).

We begin our analysis with the first document. That document is a printout of a docket sheet reflecting the criminal charges brought against Hartzell after the February 7, 2020 incident. That printout says Hartzell was charged with knowingly touching someone with intent to injure, insult, or provoke that person. The printout contains a typewritten note reading, "This occurred at a K-8 school in front of young children. Doesn't seem like this is the kind of person that should be training teachers let alone working with kids."

Divijak argues that the first sentence "simply informs the reader that the incident underlying the charged crime occurred at [a] K-8 school." This sentence does not explicitly state that Hartzell had engaged in the conduct identified in the document. However, one reasonable inference from the phrase "this occurred" is that the underlying event actually occurred. The printout indicates that Hartzell was charged with a particular crime. A reasonable person could read the note as an allegation that Hartzell committed that crime. This reading is supported by the rest of the sentence. If "this occurred" meant only that the charges had been brought, it would not make sense to say that the charges were brought at a school or that they were brought in front of young children. A reasonable jury could find that the author meant that the charged crime was what had occurred. Whether Hartzell "knowingly touch[ed Divijak with] the intent to inj[ure]/insult/provoke" is a fact rather than an opinion, and because Hartzell has offered testimony that this fact was false, she has created a triable issue as to whether this document is defamatory.

The second sentence in the note, which opines that Hartzell is not suited for training teachers, would likely not be actionable standing alone. In context, however, that

sentence supports the view that the note could be actionable defamation. That sentence immediately follows, and explains the relevance of, the statement that "this occurred." As a result, the writer implied that "this" was relevant to their view of Hartzell's fitness for her profession. False or unfounded criminal charges would not necessarily affect someone's fitness as a trainer of teachers. True ones would be far more likely to have that effect. As a result, the second sentence suggests that a reasonable person could read this note as claiming that the charges against Hartzell were based on an incident that had actually occurred.

However, a reasonable jury could not find the second document defamatory. That document is a typed, unsigned, one-paragraph note stating that Hartzell had been using her university email account to "harass, bully, intimidate[,] and threaten people." The note also states that "[a] full audit of her account will verify these accusations. Additionally, I have great concern about her mental health."

We agree with Divijak and the district court that, at least in this context, the words "harass," "bully," "intimidate," and "threaten" cannot be actionable because they "merely describe how the author of the Second Document interpreted Plaintiff's communications." Arizona courts have considered dictionary definitions to determine whether certain statements were actionable. *See, e.g.*, *Takieh*, 497 P.3d at 1007. Each of the terms used here has at least one definition that reflects a subjective opinion or belief rather than an objective, provable fact. "Bully" is defined as "to treat (someone) in a cruel, insulting, threatening, or aggressive fashion," or "to use language or behavior that is cruel, insulting, threatening, or aggressive." *Bully*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/bully [https://perma.cc/WT4N-CFRK]. "Harass"

is defined as "to annoy persistently," or "to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct." *Harass*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/harass [https://perma.cc/SB59-9JM6]. "Intimidate" is defined as "to make timid or fearful[;] frighten," or "to compel or deter by or as if by threats." *Intimidate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/intimidate [https://perma.cc/DNL9-74MH]. And "threaten" is defined as "to utter threats against," or "to cause to feel insecure or anxious." *Threaten*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/threaten [https://perma.cc/S9MT-6DRF]. Nothing in the second document suggests that "bully," "harass," "intimidate," or "threaten" is being used to do anything more than describe the author's subjective reaction to Hartzell's e-mails.[13]

Nor does the rest of the second document change the result of our analysis. The statement that the author has "great concern" about Hartzell's mental health is entirely subjective. Although the author indicated that their accusations could be "verif[ied]" by reviewing Hartzell's e-mail account, we do not believe this statement, standing alone, alters the typically subjective meaning of "harass," "bully," "intimidate," or "threaten."

Accordingly, the district court's grant of summary judgment on Hartzell's defamation claim is reversed, but only to the extent that claim rests on the first document.

---

[13] We express no view on whether these words could be actionable in another context, such as where the plaintiff is accused of engaging in sexual harassment or making criminal threats.

## CONCLUSION

For the foregoing reasons, we affirm the district court's ruling that Hartzell may not proceed on a *Monell* claim against the District based on a "final policymaker" theory or a "custom and practice" theory, that the First Amendment retaliation claim against Divijak fails because she has qualified immunity, and that the claim for procedural due process fails. However, we reverse in part because the First Amendment retaliation claim against the District is viable to the extent it is based on District Policy KFA, and because the defamation claim is viable to the extent it is based on one of the documents sent to Hartzell's employer. We remand for retrial of the referenced defamation claim against Divijak, and the § 1983 *Monell* claim against the District based on the theory that Hartzell was banned from school property pursuant to the District Policy KFA.

**REVERSED in part, AFFIRMED in part, and REMANDED.**

Each side shall bear its own costs on appeal.